[No. 58399-4. En Banc. February 10, 1994.]

THE STATE OF WASHINGTON, *Respondent*, v. ROBERT ALAN YOUNG, *Appellant*.

174

176

*Mestel & Muenster, Mark D. Mestel,* and *John R. Muenster,* for appellant.

*Seth R. Dawson, Prosecuting Attorney,* and *David F. Thiele, Deputy,* for respondent.

*Catherine W. Smith* and *Robert H. Whaley* on behalf of Washington Association of Criminal Defense Lawyers, amicus curiae for appellant.

JOHNSON, J. — The defendant contends the warrantless infrared surveillance of his home constituted a search under article 1, section 7 of the Washington State Constitution and the fourth amendment to the United States Constitution. We agree, and reverse the defendant's conviction.

I

FACTS

On August 14, 1990, the Edmonds Police Department received an anonymous note in the mail. It stated that Mr.

Robert A. Young operated "a big marijuana grow" and contained Mr. Young's name, address and telephone number.

Detective L. Paul Miller began an investigation. He confirmed the address and telephone number contained in the note belonged to Young. He checked for state and federal criminal histories on Young and found none. Detective Miller went to Young's address numerous times and observed the basement windows were consistently covered, although he never observed any bright lights in the home. Miller walked by the home on the public sidewalk, but did not detect any odor of marijuana.

Miller obtained the power consumption records for Young's home over the previous 6 years and found an abnormally high level of power consumption, and a marked increase in power consumption over the previous 3 years. Based on his prior experience in investigating indoor marijuana growing operations, he believed the power consumption increase to abnormally high levels at Young's home to be consistent with a marijuana growing operation.

A few days later, Detective Miller obtained assistance from United States Drug Enforcement Agency Special Agent Mark Hedman, who had been trained in the use of infrared thermal detection devices. An infrared device detects differences in the surface temperatures of targeted objects. Used at night, the device highlights manmade heat sources as a white color and cooler temperatures as a shade of gray. The device can detect a human form through an open window when the person is leaning against a curtain, and pressing the curtain between the window screen and his or her body. The device can also detect the warmth generated by a person leaning against a relatively thin barrier such as a plywood door.

At approximately 11:30 p.m. on August 21, 1990, Detective Miller and Agent Hedman went to Young's address and conducted a thermal surveillance of the home. The thermal detection device revealed what Hedman considered to be abnormal heating patterns. The foundation of the home was shown to be warm in certain spots, indicating the down-

stairs was warmer than the upstairs. The device revealed the lower portion of the chimney was warm but the upper portion was cool, and one of the two chimney vents was warm and the other one cool. If there had been a fire in the fireplace the entire chimney would have been warm.

Miller and Hedman checked the utility meter on the side of the home, and found it was also warm, indicating a load on the line. Miller and Hedman then used the thermal detection device to expose the heating patterns of other homes in the neighborhood, and compared those patterns with the heating pattern at Young's home. Hedman and Miller noted the pattern at Young's home differed from the other residences in the neighborhood. Miller concluded there was a marijuana growing operation in the home.

Based on an affidavit containing the facts described above, Detective Miller obtained a search warrant for Mr. Young's home on August 28, 1990. The warrant was executed and a quantity of marijuana was seized. Young was charged with possession of marijuana with intent to manufacture or deliver.

Prior to trial, Young moved to suppress the evidence and the motion was denied. The trial court found Young guilty on stipulated facts. We accepted Young's petition for direct review.

## II

### ANALYSIS

### Article 1, Section 7 of the Washington
### State Constitution

■■ The defendant argues the infrared surveillance of his home constituted an improper search under both the fourth amendment to the United States Constitution and article 1, section 7 of the Washington State Constitution. When violations of both the federal and Washington constitutions are alleged, it is appropriate to examine the state constitutional claim first. *Seattle v. Mesiani*, 110 Wn.2d 454, 456, 755 P.2d 775 (1988). The federal constitution provides the minimum protection afforded citizens against unrea-

sonable searches by the government. *State v. Chrisman*, 100 Wn.2d 814, 817, 676 P.2d 419 (1984). Greater protection may be available under the Washington Constitution. *State v. White*, 97 Wn.2d 92, 108-09, 640 P.2d 1061 (1982).

■ Whether the Washington Constitution provides a level of protection different from the federal constitution in a given case is determined by reference to the six nonexclusive *Gunwall* factors. *State v. Boland*, 115 Wn.2d 571, 575, 800 P.2d 1112 (1990); *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986). The parties have adequately briefed the *Gunwall* factors, enabling us to consider an independent state constitutional analysis in this case. *State v. Wethered*, 110 Wn.2d 466, 472-73, 755 P.2d 797 (1988).

First, we examine the text of Const. art. 1, § 7, the relevant constitutional provision. This factor is especially significant in this case because article 1, section 7 contains two distinct objects of protection: a person's "private affairs", and a person's "home". Both are at issue in this case.

■ Next, we compare the text of Washington Const. art. 1, § 7 with its parallel provision of the federal constitution, and note there are substantial differences between the two. *Gunwall*, 106 Wn.2d at 65. Examination of the constitutional history of Const. art. 1, § 7, which represents the third *Gunwall* factor, reveals our State Constitutional Convention rejected the language of the federal constitution's Fourth Amendment. Instead, the Convention adopted the language of Const. art. 1, § 7, intentionally providing greater protection of individual rights. *State v. Stroud*, 106 Wn.2d 144, 148, 720 P.2d 436 (1986). In particular, our state constitution places a greater emphasis on the right to privacy. *State v. Simpson*, 95 Wn.2d 170, 178, 622 P.2d 1199 (1980).

Factor four requires us to examine preexisting state law to determine what kind of protection this state has historically accorded the subject at issue. *Gunwall*, 106 Wn.2d at 61-62. At the time our State Constitutional Convention adopted article 1, section 7, the federal constitution had been construed to provide expansive protection of privacy interests: "all invasions on the part of the government and its employés

of the sanctity of a man's home and the privacies of life" are subject to federal constitutional protection. *Boyd v. United States*, 116 U.S. 616, 630, 29 L. Ed. 746, 6 S. Ct. 524 (1886). Nevertheless, our State Constitutional Convention determined to provide even more rigorous protection of privacy rights than those guaranteed by the Fourth Amendment. *Stroud*, 106 Wn.2d at 148. Unlike the Fourth Amendment, Const. art. 1, § 7 "clearly recognizes an individual's right to privacy with no express limitations". *Simpson*, 95 Wn.2d at 178. With this foundation, both this court and the Legislature decided an individual has a protected privacy interest in power usage records. *In re Rosier*, 105 Wn.2d 606, 717 P.2d 1353 (1986); *State v. Maxwell*, 114 Wn.2d 761, 791 P.2d 223 (1990); RCW 42.17.314. In *Rosier*, we recognized that the important policy of public disclosure of information relating to the performance of public officials cannot encroach upon the general personal privacy rights to which every citizen is entitled. *Rosier*, 105 Wn.2d at 611. The Legislature confirmed the importance of this right by prohibiting the disclosure of a person's electrical consumption without a written assertion that a particular electrical utility customer is suspected of criminal activity. RCW 42.17.314. This historical context provides substantial support for an independent state constitutional analysis in this case.

■ The fifth *Gunwall* factor, structural differences between the state and federal constitutions, will always point toward pursuing an independent state constitutional analysis because the federal constitution is a grant of power from the states, while the state constitution represents a limitation of the State's power. *State v. Smith*, 117 Wn.2d 263, 286, 814 P.2d 652 (1991) (Utter, J., concurring).

■ Under the sixth factor we examine whether the matter is of particular state interest or local concern. State law enforcement measures are a matter of local concern. *State v. Ortiz*, 119 Wn.2d 294, 320, 831 P.2d 1060 (1992) (Johnson, J., dissenting). In addition, there is no strong need for national uniformity on infrared surveillance that outweighs

the State's very strong interest in protecting an individual's right to privacy, particularly in the home.

A consideration of these factors guides us in deciding whether Const. art. 1, § 7 prohibits infrared surveillance of a home without a warrant.

## Private Affairs

■ ■ Const. art. 1, § 7 provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law". The constitution thus protects both a person's home and his or her private affairs from warrantless searches. The relevant inquiry under the Washington Constitution in determining whether there has been a search is "whether the State has unreasonably intruded into a person's 'private affairs' ". *State v. Boland*, 115 Wn.2d 571, 577, 800 P.2d 1112 (1990) (citing *State v. Myrick*, 102 Wn.2d 506, 510, 688 P.2d 151 (1984)). If no search occurs, then article 1, section 7 is not implicated. However, if the police or other governmental agent conducts a search, then Const. art. 1, § 7 is implicated and the search must be conducted pursuant to a warrant, *State v. Kennedy*, 107 Wn.2d 1, 10, 726 P.2d 445 (1986), or fall within one of the recognized exceptions to the warrant requirement, none of which are present here. *Myrick*, 102 Wn.2d at 510-11.

The private affairs inquiry is broader than the Fourth Amendment's reasonable expectation of privacy inquiry. Under the Fourth Amendment, a search occurs if the government intrudes upon a subjective and reasonable expectation of privacy. *Katz v. United States*, 389 U.S. 347, 351-52, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967). However, under the Washington Constitution the inquiry focuses on "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant". *Myrick*, 102 Wn.2d at 511. The right of privacy under Const. art. 1, § 7 is "not confined to the subjective privacy expectations of modern citizens who, due to well publicized advances in surveillance technology,

are learning to expect diminished privacy in many aspects of their lives". *Myrick*, 102 Wn.2d at 511.

■ We have previously outlined the limits to which the police can go in conducting a warrantless surveillance without intruding on a person's private affairs:

> As a general proposition, it is fair to say that when a law enforcement officer is able to detect something by utilization of one or more of his senses while lawfully present at the vantage point where those senses are used, that detection does not constitute a "search" . . ..

*State v. Seagull*, 95 Wn.2d 898, 901, 632 P.2d 44 (1981) (quoting 1 Wayne R. LaFave, *Search and Seizure* § 2.2, at 240 (1978)). The point at which a residential surveillance exceeds these limits and becomes unconstitutionally intrusive has been developed in the context of the open view doctrine. We are now asked to determine whether the warrantless infrared surveillance of a home exceeds those boundaries established by our case law.

Under the limits on surveillance established by our case law, a police officer's visual surveillance does not constitute a search if the officer observes an object with the unaided eye from a nonintrusive vantage point. *Kennedy*, 107 Wn.2d at 10. *See also State v. Myrick*, 102 Wn.2d 506, 514, 688 P.2d 151 (1984) (not a search when police conducted aerial surveillance from 1,500 feet without the use of visual enhancement devices). Accordingly, when the governmental agent is "on the outside looking outside or on the outside looking inside to that which is knowingly exposed to the public", the agent's surveillance of a home is not unconstitutionally intrusive. *State v. Myers*, 117 Wn.2d 332, 345, 815 P.2d 761 (1991) (quoting *Seagull*, 95 Wn.2d at 902).

This kind of surveillance does not violate Const. art. 1, § 7 because what is voluntarily exposed to the general public and observable without the use of enhancement devices from an unprotected area is not considered part of a person's private affairs. However, a substantial and unreasonable departure from a lawful vantage point, or a particularly intrusive method of viewing, may constitute a

search.[1] *Myers*, 117 Wn.2d at 345; *Seagull*, 95 Wn.2d at 901. The nature of the property observed may also be a factor in determining whether a surveillance is unconstitutionally intrusive. *Myrick*, 102 Wn.2d at 513.

In this case, the police were positioned on the street, which is a lawful, nonintrusive vantage point. Therefore, the question is one of the intrusiveness of the means used and the nature of the property observed. The police used an infrared thermal detection device to detect heat distribution patterns undetectable by the naked eye or other senses. With this device the officer was able to, in effect, "see through the walls" of the home. The device goes well beyond an enhancement of natural senses. In addition, the nighttime infrared surveillance enabled the officers to conduct their surveillance without Mr. Young's knowledge. The infrared device thus represents a particularly intrusive means of observation that exceeds our established surveillance limits.

The nature of the property viewed is also a factor in whether the surveillance unconstitutionally intruded on Mr. Young's private affairs. The infrared device was targeted at the outside of the home but allowed the officers to see more than what Mr. Young left exposed to public view. The device allowed the officers to draw specific inferences about the inside of the house. See Affidavit for Search Warrant, at 1; Clerk's Papers, at 13. When directed at a home, the infrared device allows the officer to determine which particular rooms a homeowner is heating, and thus using, at night. This information may reflect a homeowner's financial inability to heat the entire home, the existence and location of

---

[1]We have already determined the use of binoculars does not constitute a particularly intrusive method of viewing as long as the object observed could have been seen with the naked eye had the officer been closer to the object. *State v. Manly*, 85 Wn.2d 120, 124, 530 P.2d 306, *cert. denied*, 423 U.S. 855, 46 L. Ed. 2d 81, 96 S. Ct. 104 (1975). A police officer is allowed to use binoculars "to confirm what could otherwise lawfully be seen with the naked eye". *State v. Ludvik*, 40 Wn. App. 257, 264 n.1, 698 P.2d 1064 (1985). Under such circumstances the sense-enhancing capability of the binoculars does not provide information that could not have been obtained without the device. On the other hand, an infrared device *does* expose information that could not have been obtained without the device.

energy consuming and heat producing appliances, and possibly even the number of people who may be staying at the residence on a given night. The device discloses information about activities occurring within the confines of the home, and which a person is entitled to keep from disclosure absent a warrant. Thus, this information falls within the "private affairs" language of Const. art. 1, § 7.

The State contends this particular infrared device revealed only crude data, so this surveillance should not be considered a search. However, in construing Const. art. 1, § 7, we have resisted the uncertain protection which results from tying our right to privacy to the constantly changing state of technology. We recognize as technology races ahead with ever increasing speed, our subjective expectations of privacy may be unconsciously altered. Our right to privacy may be eroded without our awareness, much less our consent. We believe our legal right to privacy should reflect thoughtful and purposeful choices rather than simply mirror the current state of the commercial technology industry. At the same time, a privacy right that is defined by a particular level of technological sophistication is administratively unworkable. Governmental agents could not be certain at what point a warrant is required.

The current boundaries on police surveillance established by our case law allow the police to conduct effective investigations without depriving people of the sense of privacy they have held and are entitled to hold in this state. We are not prepared to extend those boundaries to include warrantless infrared surveillance. The infrared thermal detection investigation represents a particularly intrusive method of surveillance which reveals information not otherwise lawfully obtained about what is going on within the home.

The use of the thermal detection device to perform a warrantless, infrared surveillance violated the Washington State Constitution's protection of the defendant's private affairs.

## Invasion of the Home

In addition to "private affairs", Const. art. 1, § 7 explicitly protects the "home". In this case, a discussion of the protection

of the home overlaps to some extent our analysis of the protection of private affairs because this case involves private activity within the home. However, we address the protection of the home separately because it is a distinct concept, which is of particular significance when discussing sense-enhanced surveillance.[2]

■ Our decisions have consistently reflected the principle that the home receives heightened constitutional protection. Generally, a person's home is a highly private place. *State v. Berber*, 48 Wn. App. 583, 589, 740 P.2d 863, 74 A.L.R.4th 491, *review denied*, 109 Wn.2d 1014 (1987). In no area is a citizen more entitled to his privacy than in his or her home. *State v. Solberg*, 122 Wn.2d 688, 861 P.2d 460 (1993). For this reason, "the closer officers come to intrusion into a dwelling, the greater the constitutional protection". *State v. Chrisman*, 100 Wn.2d 814, 820, 676 P.2d 419 (1984).

■ The State argues the use of the infrared device did not violate the constitution's provision protecting the home because there was no physical invasion of the home. According to the State, because the infrared device did not send beams into the home, no search occurred. Brief of Respondent, at 3, 7. However, it is now well established that the occurrence of a search does not depend "upon the presence or absence of a physical intrusion into any given enclosure". *Katz v. United States*, 389 U.S. 347, 353, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967). The trespass doctrine has long since been discarded. *United States v. Karo*, 468 U.S. 705, 713, 82 L. Ed. 2d 530, 104 S. Ct. 3296 (1984). Under Washington Const. art. 1, § 7, like the Fourth Amendment, a person's home can be invaded even though there is no physical entrance into the house. *State v. Holeman*, 103 Wn.2d 426, 429, 693 P.2d 89 (1985).

In *Katz*, the defendant's telephone conversation from a public telephone booth was recorded by the police. The Court

---

[2]The State is correct that in examining the protection of a person's *private affairs*, we no longer do a *protected places* analysis. The location of the search is but one factor in a private affairs analysis. *Myrick*, 102 Wn.2d at 513. However, in examining our state constitution's explicit protection of the *home*, the fact the search occurs at a home is central to the analysis.

held this constituted a search under the Fourth Amendment because the defendant legitimately expected privacy during the telephone call. The Court said the "fact that the electronic device employed to achieve that end did not happen to penetrate the wall of the booth can have no constitutional significance". *Katz*, 389 U.S. at 353. Likewise, in this case, the thermal detection unit did not send any rays or beams into the home, but nevertheless pierced through the walls of the home.

The infrared device invaded the home in the sense the device was able to gather information about the interior of the defendant's home that could not be obtained by naked eye observations. Without the infrared device, the only way the police could have acquired the same information was to go inside the home. Just because technology now allows this information to be gained without stepping inside the physical structure, it does not mean the home has not been invaded for the purposes of Const. art. 1, § 7.

> Merely because it is generally known that the technology exists to enable police to view private activities from an otherwise nonintrusive vantage point, it does not follow that these activities are without protection.

*Myrick*, 102 Wn.2d at 513. The constitutional line of privacy that encircles the home is more than just a barrier to physical penetration. When sense-enhancing devices allow police to "see through the walls" of a home, the home has been invaded for purposes of Const. art. 1, § 7.

The "heightened protection afforded state citizens against unlawful intrusion into private dwellings places an onerous burden upon the government to show a compelling need to act outside of our warrant requirement". *Chrisman*, 100 Wn.2d at 822. The State has failed to demonstrate such a need in this case. Therefore, the warrantless use of the infrared device violated our constitution's protection of the home.

It is especially troubling that the police conducted thermal investigations not only on the defendant's home, but on the homes of his neighbors as well. After the police used the

device on the defendant's home, "[o]ther houses in the area were viewed and none exhibited the same type of heat patterns". Clerk's Papers, at 17. There is no indication these neighbors were suspected of any criminal activity whatsoever. If we were to hold the use of the device does not constitute a search, no limitation would be placed on the government's ability to use the device on *any* private residence, on *any* particular night, even if no criminal activity is suspected. Such police activity is constitutionally offensive.

Such unrestricted, sense-enhanced observations present a dangerous amount of police discretion. This kind of surveillance avoids the protection of a warrant issued upon probable cause by a neutral magistrate. Not only does this practice eviscerate the traditional requirement that police identify a particular suspect prior to initiating a search, but it also facilitates clandestine investigations by the police force, which are not subject to the traditional restraint of public accountability. David E. Steinberg, *Making Sense of Sense-Enhanced Searches*, 74 Minn. L. Rev. 563, 569 (1989-1990). Such secret surveillance may not only chill free expression, but also may encourage arbitrary and inappropriate police conduct. 74 Minn. L. Rev. at 569.

Finally, the State contends the use of infrared surveillance does not violate the Washington State Constitution because the surveillance is analogous to the warrantless use of police dogs trained to sniff and identify the presence of drugs. To date, dog sniffs have not been classified as searches by our case law. According to the State, just as odor escapes a compartment or building and is detected by the sense-enhancing instrument of a canine, so also does heat escape a home and is detected by the sense-enhancing infrared camera. Brief of Respondent, at 5. Therefore, the argument is that if a dog sniff is not a search, neither should infrared surveillance constitute a search.

However, the analogy misses the mark. Thus far the Washington courts have refused to adopt the United States Supreme Court's blanket rule that dog sniffs are not searches. *State v. Boyce*, 44 Wn. App. 724, 729, 723 P.2d 28

(1986). Instead, our courts have employed a more conservative approach to dog sniffs and require an examination of the circumstances of the sniff. *Boyce*, 44 Wn. App. at 729.

The question whether and under what conditions a warrantless dog sniff might constitute a violation of Const. art. 1, § 7 is not before the court. For the purpose of the State's argument, however, we note that private residences were not involved in any of the cases decided by the Washington appellate courts where warrantless dog sniffs were approved. *See State v. Stanphill*, 53 Wn. App. 623, 769 P.2d 861 (1989) (dog sniff of package at post office not a search); *State v. Boyce*, 44 Wn. App. 724, 723 P.2d 28 (1986) (dog sniff of safety deposit box at a bank not a search); *State v. Wolohan*, 23 Wn. App. 813, 598 P.2d 421 (1979) (dog sniff of parcel in bus terminal not a search), *review denied*, 93 Wn.2d 1008 (1980). That the object of the search is a home is critical.

In fact, in each of these cases the courts acknowledged a dog sniff might constitute a search if the object of the search or the location of the search were subject to heightened constitutional protection. *Stanphill*, 53 Wn. App. at 630-31; *Boyce*, 44 Wn. App. at 729; *Wolohan*, 23 Wn. App. at 820 n.5. Therefore, the State's analogy of infrared sense enhancement to the canine sniff cases is not useful.

We hold the infrared surveillance not only violated the defendant's private affairs, but also constituted a violation of the Washington State Constitution's protection against the warrantless invasion of his home.

### Fourth Amendment

We need not reach the issue of whether infrared surveillance of the defendant's home violates the fourth amendment to the United States Constitution since we find that it violates Const. art. 1, § 7. *Allied Daily Newspapers v. Eikenberry*, 121 Wn.2d 205, 209, 848 P.2d 1258 (1993). However, for the purpose of providing guidance to other courts on the subject of sense-enhanced surveillance of a home, we proceed to analyze the defendant's federal constitutional claim. We hold the infrared surveillance violated the Fourth Amendment.

 A search occurs for Fourth Amendment purposes when "an expectation of privacy that society is prepared to consider reasonable is infringed". *Soldal v. Cook Cy.*, 506 U.S. 56, 121 L. Ed. 2d 450, 459, 113 S. Ct. 538 (1992) (quoting *United States v. Jacobsen,* 466 U.S. 109, 113, 80 L. Ed. 2d 85, 104 S. Ct. 1652 (1984)). People have a reasonable expectation of privacy in their own homes. *Payton v. New York*, 445 U.S. 573, 589, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980).

Additionally, like our state constitution, the federal constitution specifically protects the home: "The right of the people to be secure in their . . . houses . . . shall not be violated . . . ". U.S. Const. amend. 4. Homes enjoy a special status in federal constitutional jurisprudence. "[T]he right of a man to retreat into his own home and there be free from unreasonable governmental intrusion" stands at the "very core" of the Fourth Amendment. *Silverman v. United States*, 365 U.S. 505, 511, 5 L. Ed. 2d 734, 81 S. Ct. 679, 97 A.L.R.2d 1277 (1961). Therefore, searches and seizures in public places are treated differently than searches and seizures occurring in the home. *Payton*, 445 U.S. at 576, 587. Accordingly, the Supreme Court has differentiated between the use of sensory enhancement devices in homes from their use on other objects. *Compare United States v. Karo*, 468 U.S. 705, 82 L. Ed. 2d 530, 104 S. Ct. 3296 (1984) *with United States v. Knotts*, 460 U.S. 276, 75 L. Ed. 2d 55, 103 S. Ct. 1081 (1983).

In *Knotts*, the defendant purchased a drum of chloroform containing an electronic beeper, or tracking device. He placed the drum in his vehicle, and drove to a cabin in the woods. Federal agents tracked the movement of the vehicle to the cabin, but did not continue to monitor the beeper once it had moved indoors. *Knotts*, 460 U.S. 278-79. The Court held this use of the beeper did not constitute a search. Rather, the Court characterized the activity as "amount[ing] principally to the following of an automobile on public streets and highways", *Knotts*, 460 U.S. at 281, and noted the information discovered by tracing the beeper could have been discovered by unenhanced, visual surveil-

lance. *Knotts,* 460 U.S. at 282. Moreover, the beeper trace did not constitute a search because a person has a lesser expectation of privacy in a car because "it seldom serves as one's residence". *Knotts,* 460 U.S. at 281 (quoting *Cardwell v. Lewis,* 417 U.S. 583, 590, 41 L. Ed. 2d 325, 94 S. Ct. 2464 (1974) (plurality opinion)).

In contrast, *Karo* involved an electronic beeper which was taken inside a home. *Karo* contains the Supreme Court's most recent statement on the use of a sensory enhancement surveillance device on a private residence. The Court found the warrantless monitoring of the electronic beeper inside a private residence, a location not observable by the naked eye, violated the Fourth Amendment. *United States v. Karo,* 468 U.S. 705, 714, 82 L. Ed. 2d 530, 104 S. Ct. 3296 (1984).

In *Karo,* the defendant bought a can of ether, unaware a beeper had been placed inside the can by government agents. The beeper allowed the police to track the container as it traveled public roads to the defendant's home. From his home, the defendant transported the container along public roads to another defendant's home. That defendant then took the marked container to a commercial storage facility, then to a third defendant's home, and finally to a house rented by all three defendants.

While in the defendants' vehicles on public roads en route to each of these locations or while in the storage facility, the Court held the monitoring of the beeper did not constitute a search. The defendants had no protected privacy interest in what could have been visually observed in these public places. *Karo,* 468 U.S. at 720-21. However, each time the container crossed the threshold of a home, the monitoring of the beeper was held to constitute a search requiring a warrant. The Court found the monitoring of the device revealed information about the interior of the home the agents could not have obtained through unaided visual surveillance of the home's exterior:

> In this case, had a [government] agent thought it useful to enter the . . . residence to verify that the ether was actually in the house and had he done so surreptitiously and without a

warrant, there is little doubt that he would have engaged in an unreasonable search within the meaning of the Fourth Amendment. *For purposes of the Amendment, the result is the same where, without a warrant, the Government surreptitiously employs an electronic device to obtain information that it could not have obtained by observation from outside the curtilage of the house.*

(Italics ours.) *Karo*, 468 U.S. at 715. The agents' act of monitoring the beeper inside the home thus infringed on the homeowners' reasonable expectation of privacy, and such use constituted a search for Fourth Amendment purposes.

In this case, the infrared device used was at least as intrusive as the beeper in *Karo*. In *Karo*, the beeper was not sensitive enough to reveal the can's precise location within an enclosed structure. *Karo*, 468 U.S. at 708. In contrast, the infrared device at issue here reveals the specific location of heat within the home. An infrared device need not produce the equivalent of a photographic image before it is declared intrusive under the Fourth Amendment:

[t]he monitoring of an electronic device such as a beeper is, of course, less intrusive than a full-scale search, but it does reveal a critical fact about the interior of the premises that the Government is extremely interested in knowing and that it could not have otherwise obtained without a warrant.

*Karo*, 468 U.S. at 715. Here, like *Karo*, the information conveyed by the infrared device was critical to the government. The police relied heavily on the infrared surveillance results, and the inferences that could be drawn from them, in obtaining the search warrant.

The State contends that *United States v. Penny-Feeney*, 773 F. Supp. 220 (D. Hawaii 1991), *aff'd on other grounds*, 984 F.2d 1053 (9th Cir. 1993) represents the correct Fourth Amendment analysis of infrared surveillance of a home. The *Penny-Feeney* court held the use of the thermal detection device was not a search because the device only exposed "heat waste", or "abandoned heat", in which the defendant had no legitimate expectation of privacy. *Penny-Feeney*, 773 F. Supp. at 225-26. The court reasoned the defendant voluntarily vented outside the heat waste observed by the police.

This heat waste is like the garbage an individual sets outside for collection, and in which the United States Supreme Court has held there is no reasonable expectation of privacy. *California v. Greenwood*, 486 U.S. 35, 100 L. Ed. 2d 30, 108 S. Ct. 1625 (1988).

We first note although *Penny-Feeney* was affirmed on appeal, the grounds affirmed on were different than those relied on by the District Court. The Ninth Circuit expressly declined to address whether the use of the infrared device without a warrant violated the Fourth Amendment, which undermines the State's reliance on the trial court's reasoning in *Penny-Feeney*. *United States v. Feeney*, 984 F.2d 1053, 1054-55 (9th Cir. 1993).

Additionally, we find the reasoning of the District Court in *Penny-Feeney* unpersuasive.[3] First, it is difficult to say one voluntarily vents heat waste in the same way that one disposes of garbage. Heat, unlike garbage, automatically leaves a person's home without any deliberate participation by the homeowner. Even if some heat is vented to the outside, as in *Penny-Feeney*, the device detects all heat leaving the home, not just the heat directed out through the vent. Moreover, the *Greenwood* court relied in part on the notion that when one places garbage out at the curb, one assumes the foreseeable risk of other people, children, or animals discovering and seizing what is in the garbage can. However, it is difficult to say one should expect other people to use sophisticated infrared instruments on one's home to

---

[3]We note that this argument even more clearly fails in a state constitutional analysis because in reaching its decision the *Penny-Feeney* court relied on cases and analyses already rejected by this court. The *Penny-Feeney* court relied on *California v. Greenwood*, 486 U.S. 35, 100 L. Ed. 2d 30, 108 S. Ct. 1625 (1988), which held that an individual has no protected privacy interest in garbage placed curbside for collection. We declined to follow *Greenwood*. Rather, in *State v. Boland,* 115 Wn.2d 571, 800 P.2d 1112 (1990) we held Const. art. 1, § 7 includes an individual's garbage within the private affairs protection. Similarly, the *Penny-Feeney* court relied on *Smith v. Maryland,* 442 U.S. 735, 61 L. Ed. 2d 220, 99 S. Ct. 2577 (1979), for the proposition that a pen register is a sense-enhancing device and its use does not constitute a search. In contrast, we held the use of a pen register requires a warrant. *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986).

view so-called heat waste. The *Greenwood* court also noted one can avoid the risk by not placing private information in the garbage. On the other hand, the only way for a person to avoid the risk of exposure in this case, and in *Penny-Feeney*, would be to turn off all heat sources in the home, even in subzero temperatures. In addition, one could not stand near an open window or any part of the home constructed of material such as plywood because the device is capable of revealing the presence of human forms in these circumstances. See Stipulation Regarding Technical Capabilities of the Infra-Red Thermal Imager, at 3.

An even more important distinction between garbage set out for collection and the images produced by infrared surveillance is what is actually being searched for by the infrared device. The only value of the so-called heat waste is what it discloses about the interior of the home. The infrared device produces an image of the interior of the home that otherwise is protected by the home's walls. In this sense, the infrared thermal device allows the government to intrude into the defendant's home and gather information about what occurs there. A resident has a reasonable expectation of privacy in what occurs within the home, "a location not open to visual surveillance". *Karo*, 468 U.S. at 714. It is this reasonable expectation of privacy in the home that is violated by warrantless infrared surveillance, not the expectation of privacy in "heat waste" as the *Penny-Feeney* court asserts.

The *Penny-Feeney* court compared the use of infrared surveillance to the use of dogs trained to sniff for the presence of drugs. Relying on *United States v. Solis*, 536 F.2d 880 (9th Cir. 1976), the *Penny-Feeney* court found the heat emanations detected by infrared are similar to odor emanations detected by trained dogs. We find the analogy of infrared surveillance to dog sniffs is not appropriate, in part because the United States Supreme Court has declared a "canine sniff is *sui generis.*" *United States v. Place*, 462 U.S. 696, 707, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983). The canine sniff is distinct from other investigative procedures, both in

the manner in which the evidence is obtained and the content of the information revealed. *Place*, 462 U.S. at 707.

Even if canine sniffs were an appropriate analogy, we find the reasoning in *United States v. Thomas*, 757 F.2d 1359 (2d Cir.), *certs. denied*, 474 U.S. 819 (1985), 479 U.S. 818 (1986) more persuasive than that of *Solis*. In *Thomas*, the Court held the use of a trained dog to sniff for narcotics outside the defendant's apartment door constituted a search that, absent a warrant, violated the Fourth Amendment.

The *Thomas* court attached significance both to the method of sensory enhancement and to the fact a private residence was at issue:

> With a trained dog police may obtain information about what is inside a dwelling that they could not derive from the use of their own senses. Consequently, the officers' use of a dog is not a mere improvement of their sense of smell, as ordinary eyeglasses improve vision, but is a significant enhancement accomplished by a different, and far superior, sensory instrument. Here the defendant had a legitimate expectation that the contents of his closed apartment would remain private, that they could not be "sensed" from outside his door. . . . Because of [the] defendant['s] heightened expectation of privacy inside his dwelling, the canine sniff at his door constituted a search. As the agent had no warrant, the search violated the Fourth Amendment.

*Thomas*, 757 F.2d at 1367. The *Thomas* court correctly recognized that when a private dwelling is the object of a search, and the means used reveal more than what a person can be said to knowingly expose, the protections of the Fourth Amendment are triggered.

When the police use sense-enhancing devices to obtain information from someone's home that could not be obtained by unaided observation of the exterior, they should have a search warrant. *Karo*, 468 U.S. at 714. Because the police did not obtain a warrant prior to using the device in this case, we hold the search also violated the Fourth Amendment.

## Probable Cause

The defendant claims that without the information improperly obtained by the infrared surveillance, the police

did not have probable cause to support a search warrant. We agree.

■ Probable cause is established when the affidavit sets forth facts sufficient to lead a reasonable person to conclude there is a probability the defendant is involved in criminal activity. *State v. Cord*, 103 Wn.2d 361, 365-66, 693 P.2d 81 (1985). The application for a search warrant must be judged in the light of common sense, with doubts resolved in favor of the warrant. *State v. Partin*, 88 Wn.2d 899, 904, 567 P.2d 1136 (1977). Generally, the probable cause determination of the issuing judge is given great deference. *State v. Huft*, 106 Wn.2d 206, 211, 720 P.2d 838 (1986).

In this case, the affidavit for the search warrant was based on an anonymous tip that the defendant was growing marijuana; confirmation that the address and telephone number given by the informant belonged to Young; public utility records showing high electricity consumption for the type of house, and a dramatic increase in consumption over the last 3 years; the observed absence of utilities using large amounts of electricity, such as hot tubs or saunas, which might explain the high consumption; the officer's observation that the basement windows were consistently covered; the government agents' judgment that this information pointed to a growing operation; and the results of infrared surveillance. Brief of Respondent, at 1-4; Brief of Appellant, at 16-17.

The informant's tip as a basis for probable cause fails to meet the 2-prong test of *Aguilar-Spinelli*. *Spinelli v. United States*, 393 U.S. 410, 413, 21 L. Ed. 2d 637, 89 S. Ct. 584 (1969); *Aguilar v. Texas*, 378 U.S. 108, 114, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964); *State v. Murray*, 110 Wn.2d 706, 711, 757 P.2d 487 (1988). This test requires the informant's basis of knowledge and veracity be established. *Murray*, 110 Wn.2d at 711. However, if a police investigation reveals suspicious activity along the lines of the criminal behavior proposed by the informant, then the corroborating investigation may replace the requirements of *Aguilar-Spinelli*. *State v. Jackson*, 102 Wn.2d 432, 438, 688 P.2d 136 (1984). More than public or innocuous facts must be corroborated, however. *Jackson*, 102 Wn.2d at 438.

Here, the police investigation corroborated the phone number and address given by the informant and discovered abnormally high electrical consumption. These are innocuous facts that do not necessarily indicate criminal activity. *Huft*, 106 Wn.2d at 211. The additional fact the windows of the basement were always covered does not add enough to the equation to support a finding of probable cause. The primary basis of the probable cause determination was the illegally obtained infrared surveillance. Without the results of the infrared surveillance, and the interpretation of those results by Detective Miller and Agent Hedman, the police did not have sufficient incriminating information to obtain a warrant.

Therefore, the probable cause determination must be reversed and the evidence seized under the warrant excluded. *State v. White*, 97 Wn.2d 92, 110, 640 P.2d 1061 (1982). Consequently, the defendant's conviction is reversed.

UTTER, BRACHTENBACH, DOLLIVER, and SMITH, JJ., concur.

GUY, J., concurs in the result.

DURHAM, J. (concurring) — I agree with the majority (pages 188-194) that the use of the infrared device in this case constituted a search under the fourth amendment to the United States Constitution. I would, therefore, reverse Young's conviction. I do not, however, concur in the majority's analysis of article 1, section 7 of the Washington State Constitution.

ANDERSEN, C.J., concurs with DURHAM, J.

MADSEN, J. (concurring) — I concur only with the majority's analysis and result under article 1, section 7 of the Washington State Constitution.