# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71111-3-I |
| Respondent, | ) ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| DENNIS WYATT, | ) ) | |
| Appellant. | ) ) | FILED: April 20, 2015 |
| | ) | |

APPELWICK, J. — Police officers performed a warrantless search of closed containers found outside Wyatt's tent in a city park while Wyatt was away from his campsite. The officers found materials used to make meth inside the containers. The search resulted in Wyatt's arrest, confession, and subsequent conviction for manufacturing methamphetamine. The trial court denied Wyatt's motion to suppress the items inside the containers, finding that Wyatt had no expectation of privacy in those items. We reverse and remand.

## FACTS

On October 30, 2011, City of Kent Police Department Officer Kenneth Clay and Sergeant Andrew Kelso[1] were working routine bicycle patrol. During their patrol, the officers spoke with a street source. The source claimed to have heard someone named "Dennis" brag about stealing wiring from a railroad. The source also said that Dennis cooks meth in holes in the ground. The source told the officers that Dennis lived in a tent camp in Riverview Park, a park owned by the city of Kent. The source was able to identify a more specific location for the campsite on a map. The source confirmed that Dennis was a homeless individual.

---

[1] Sergeant Kelso was an officer at the time these events took place.

Based on the source's description, Sergeant Kelso recalled that he previously had contact with a man matching the description. After checking his earlier contact report, Sergeant Kelso was able to confirm that the source was describing Dennis Wyatt.

The following afternoon, on October 31, 2011, Officer Clay and Sergeant Kelso went to Riverview Park to find the camp. At the end of a well-worn pathway the officers found a camp that was occupied by Wyatt, Jennifer Johnson, and another male.[2]

Sergeant Kelso notified and warned Wyatt and Johnson that it was illegal to camp in the park. The officers advised Wyatt and Johnson that they had 24 hours to gather their belongings and leave the campsite. Wyatt and Johnson said that they knew camping in the park was illegal, but that they had been camping there for only two days. Johnson further stated that the tent was theirs, but the remaining items at the campsite were there when they arrived.

Forty-five minutes after the officers left the campsite, they saw Wyatt and Johnson walking away from the campsite. The officers returned to the camp. While no one was there, the officers looked under a tarp located roughly eight to fifteen feet from the tent. Sergeant Kelso found a black zipped up bag that was inside a five gallon bucket under the tarp. Inside the zipped bag, Sergeant Kelso found a bottle with a hole drilled in the top with a hose sticking out of the hole. The bottle had a dark, amber liquid in it.

The officers also found a blue soft-sided container (similar to a cooler) outside the tent. There were plastic bottles, duct tape, tubing, and a small pressurized gas container inside the blue container. Based on both Sergeant Kelso's and Officer Clay's training and

---

[2] The other male was just visiting the campsite and was later arrested based on outstanding warrants.

2

experience, they believed the items in the black bag and the blue container were associated with a methamphetamine (meth) lab.

The officers did not look inside the tent. The officers replaced the tarp, left the scene, and contacted the Department of Ecology's on-call spill responder about the lab. The officers and the spill responder decided that the lab should be processed in the morning during the daylight when it would be safer.

On November 1, 2011, at approximately 10:45 a.m., Sergeant Kelso and Sergeant Mike O'Reilly returned to Riverview Park to process the meth lab with Richard Walker, a Department of Ecology spill responder. Sergeant Kelso and Sergeant O'Reilly went to the camp and called out to see if anyone was inside the tent. Moments later, Wyatt and Johnson came out of the tent. Both Wyatt and Johnson were arrested for unlawful camping and investigation of manufacturing meth and read their Miranda[3] rights. Both Wyatt and Johnson waived their rights and spoke with the officers. The officers led Wyatt and Johnson away from the tent, across a field, and toward patrol vehicles before questioning them.

Sergeant Kelso spoke with Wyatt. Wyatt eventually told Sergeant Kelso that he had been camping in Riverview Park for several weeks. Wyatt initially denied knowledge of the meth lab in the camp. But, after a little while, Wyatt admitted that he knew there was a meth lab and admitted that his fingerprints would be on the items from cleaning up the area.

---

[3] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Sergeant O'Reilly spoke with Johnson. Johnson denied any involvement with the meth lab but admitted that she rummaged through all of the property when the two first got to the camp. Johnson said that they had been at the camp for two weeks.

Sergeant O'Reilly then went to speak with Wyatt. Wyatt told Sergeant O'Reilly that they had been at the campsite for three weeks. Employing a ruse, Sergeant O'Reilly told Wyatt that he heard Wyatt was cooking meth and selling it to kids. Sergeant O'Reilly indicated that if Wyatt was selling to kids, as opposed to for personal use, Sergeant O'Reilly would "have a real problem with his actions." Wyatt then admitted to cooking meth at the campsite for his personal use.

After Wyatt and Johnson were transported to the station, the officers and Walker returned to the camp. At the camp, there was a tent and items around or near the tent. Some of the items were under a tarp. The officers could not remember if the blue container was covered by the tarp when they returned. The officers opened the blue container and found many materials used to make meth. The officers also found the zipped black bag with a soda bottle with tubing coming out of it, muriatic acid, and another bottle containing liquids. While these items were being processed, Sergeant O'Reilly went into the tent and found several bags with items related to a meth lab. Sergeant O'Reilly took into custody items from the tent, which were either associated with the meth lab, illegal contraband, or weapons.

The State charged Wyatt and Johnson with manufacturing meth in violation of RCW 69.50.401(1), (2)(b). Wyatt moved to suppress both the physical evidence from the campsite and his statements to the officers. After a combined CrR 3.5 and CrR 3.6 hearing, the trial court partly granted and partly denied the motions. The trial court

suppressed the evidence obtained from inside the tent, but admitted the evidence obtained in the closed containers found outside the tent. The court reasoned that Wyatt had no reasonable expectation of privacy in the area outside of the tent, but that he did have a reasonable expectation of privacy in the items inside the bags inside the tent. The trial court did not suppress Wyatt's confession to Sergeant O'Reilly or any other statements.

The jury convicted Wyatt of manufacturing a controlled substance. The trial court sentenced Wyatt to a prison based drug offender sentencing alternative (DOSA) with 41.75 months in prison and 41.75 months in the community. The trial court enhanced Wyatt's sentence by 24 months based on the jury's finding that the offense had been committed inside a public park.

Wyatt appeals.

## DISCUSSION

Wyatt argues that the trial court erred when it concluded that the warrantless search of the containers nearby his tent was lawful. Wyatt challenges the trial court's conclusion that he had no expectation of privacy in the closed containers outside the tent. Wyatt contends that closed containers within a camp are both a private affair under article I, section 7 of the Washington State Constitution and that he had a reasonable expectation of privacy in those closed containers on his campsite under the Fourth Amendment of the United States Constitution.

This court reviews de novo conclusions of law from an order pertaining to the suppression of evidence. State v. Valdez, 167 Wn.2d 761, 767, 224 P.23d 751 (2009). When violations of both the federal and Washington constitutions are alleged, it is

5

appropriate to examine the state constitutional claim first. State v. Young, 123 Wn.2d 173, 178, 867 P.2d 593 (1994).

I. Article I, section 7

Article I, section 7 of the Washington Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." The relevant inquiry for determining when a search has occurred is whether the state unreasonably intruded into the defendant's "private affairs," not whether a person's expectation of privacy is reasonable. State v. Boland, 115 Wn.2d 571, 587-88, 800 P.2d 1112 (1990). The private affairs inquiry focuses on those privacy interests in which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant. State v. Surge, 160 Wn.2d 65, 71-72, 156 P.3d 208 (2007).

It is well established that article I, section 7 qualitatively differs from the Fourth Amendment and in some areas provides greater protections than does the federal constitution. Jorden, 160 Wn.2d at 126. But, a determination that a given state constitutional provision affords enhanced protection in one context does not necessarily mandate such a result in a different context. State v. McKinney, 148 Wn.2d 20, 26, 60 P.3d 46 (2002). We must therefore determine whether article I, section 7 affords enhanced protection in this particular context. Surge, 160 Wn.2d at 71.

Wyatt contends that the Washington Supreme Court in Boland, 115 Wn.2d at 580, determined that article 1, section 7 affords enhanced protection in this context. Wyatt argues that Boland stands for the proposition that containers and their contents are among the private affairs protected by article I, section 7.

In Boland, the court held that garbage placed in a closed trash container left outside of a home on a curb is a private affair to be protected under article I, section 7. 115 Wn.2d at 578. The court emphasized the fact that the garbage was in a closed can and that the discarder of the garbage expected that it would be picked up by a licensed garbage collector—not searched by the government. Id. at 578. The court noted that the fundamental purpose of the state constitution is to govern the relationship between the people and their government, rather than to govern the relationship between private parties. Id. at 575. Thus, the court reasoned, it follows that the constitution would concern itself with only the reasonableness of governmental intrusion into a private individual's garbage. Id. The court acknowledged that it may be unreasonable to expect that children, scavengers, or snoops will not sift through one's garbage. Id. at 578. However, it concluded that average persons would find it reasonable to believe the garbage they placed in their closed trash cans will be protected from warrantless government intrusion. Id.

Here, like in Boland, Wyatt's items were in closed containers in close proximity to a residence. While the residence here was admittedly temporary, that did not diminish the private nature of Wyatt's containers. Like garbage on a curb, unattended belongings in a park may be susceptible to intrusion from snoops and scavengers. However, it is reasonable to believe that police officers would not open and search containers associated with a campsite without a warrant. This belief is even more reasonable than in Boland, because Wyatt did not discard his belongings. And, the officers specifically warned Wyatt that he had 24 hours to leave the park, reinforcing Wyatt's expectation that his containers would be safe from police intrusion. An average citizen hearing that

7

statement should be entitled to expect that he and his possessions would not be disturbed by the officers for at least 24 hours.

Garbage in a closed container set out on the curb for all to see and to be collected constitutes a private affair. Wyatt's closed containers, stored in his sequestered campsite near his tent, not put out as discarded garbage surely also constitutes a private affair under article I, section 7. Search of the containers without a warrant was unconstitutional. The trial court erred when it denied Wyatt's motion to suppress the evidence obtained as a result of the search.

II. Fourth Amendment

Even if the contents of Wyatt's closed containers were not considered a private affair under article I, section 7, the search would still have been improper under the Fourth Amendment. See State v. Cleator, 71 Wn. App. 217, 857 P.2d 306 (1993).

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated..." Const. Amend. IV. Under the Fourth Amendment, a search occurs if the government intrudes upon an individual's reasonable expectation of privacy. Young, 123 Wn.2d at 181. The relevant inquiry for whether an individual has a reasonable expectation of privacy is (1) whether an individual by his conduct has exhibited a subjective expectation of privacy in a particular place or object and (2) whether that expectation of privacy is one that society recognizes. Katz v. United States, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring).

The trial court concluded that the search of the area outside of Wyatt's tent was permissible, because Wyatt had no expectation of privacy in those items. Relying on this

court's holdings in State v. Pentecost, 64 Wn. App. 656, 825 P.2d 365 (1992) and Cleator, 71 Wn. App. 217, the trial court opined that courts have held there is no reasonable expectation of privacy in the area surrounding an illegal camp. Both Pentecost and Cleator held that the defendants in the unlawful encampments at issue were not entitled to Fourth Amendment protection. Pentecost, 64 Wn. App. at 659-60; Cleator, 71 Wn. App. at 222. Consequently, the trial court concluded that the search of the items, all items, outside of the tent was proper and that those items were admissible at trial.

At issue in Pentecost were an illegal camper's privacy rights in unenclosed items on the ground around his campsite. 64 Wn. App. at 657-58. A property owner called the police to report a trespasser camping on his private property and noted that he believed there were marijuana plants growing on his property. Id. at 657. Officers arrived to investigate. Id. When the officers approached the camp, Pentecost was sitting on a chair in front of a tent. Id. One of the officers informed Pentecost that he was trespassing and the officer asked him for identification. Id. When Pentecost went into his tent to retrieve his identification, one of the officers was able to see a shotgun inside the tent. Id. The officer entered the tent to retrieve the shotgun. Id. While conducting a cursory search for other weapons around the campsite, the officer saw items (nails, boots, fertilizer, and bug repellent) linking Pentecost to a marijuana growing operation found about three-quarters of a mile away. Id. at 657-58. The other items were in plain view, scattered around the campsite. Id. The officer arrested Pentecost for manufacturing marijuana. Id. at 658.

On appeal, Pentecost argued that the officer's entry into the area within his campsite and observation of his items constituted an illegal search and seizure, because he had an expectation of privacy in the surrounding curtilage of his campsite. Id. at 658-

59. The court opined that Pentecost's argument failed under the second prong of the Katz test—Pentecost's subjective expectation of privacy in the campsite is not one that society is prepared to recognize. Id. at 659.

In rejecting Pentecost's privacy interest, in the items surrounding the campsite the court stated,

> Mr. Pentecost cites no direct authority for his assertion society regards unenclosed items left around a campsite as private. As for his analogy to the curtilage of a residence, we see material distinctions between a campsite and such an area. Principal among these distinctions is the fact a homeowner or tenant has the right under property law to exclude others. We know of no similar right in one who trespasses and camps upon another person's land.

Pentecost, 64 Wn. App. at 659-60. Notably, the Pentecost court explicitly stated that a different question is presented where items are enclosed in a suitcase or some other container. Id. at 660 n.3. As such, Pentecost is distinguishable from the case here, where Wyatt's items were in an enclosed bag and a container.

In Cleator, a trespassing camper's privacy rights as to items inside his tent were at issue. 71 Wn. App. 218, 222. There, police responded to a report of burglary. Id. at 218. An officer found a camp with a tent about 150 yards in the woods behind the burglarized house. Id. The officer believed that the tent was erected on city property. Id. The officer called out for the occupant, and no one replied. Id. The officer lifted open the flap of the tent to see if a person was hiding inside for officer safety purposes and to check for weapons. Id. Inside, without moving any items, the officer saw items matching the burglarized items. See id The officer went into the tent and took the burglarized items. Id. The police returned the next day and arrested Cleator. Id. at 219.

Cleator moved to suppress the property recovered from the tent on the grounds that he had a reasonable expectation of privacy in the tent. Id. The Cleator court affirmed the denial of Cleator's motion to suppress, reasoning that most courts reject an individual's claim to the right of privacy in the temporary shelter he or she wrongfully occupies on public property. See Id. at 222-23. The court reasoned that, as a wrongful occupant of public land, Cleator had no reasonable expectation of privacy at the campsite because he had no right to remain on the property and could have been ejected at any time. Id. at 222.

Cleator is also distinguishable. The Cleator court based its holding on its reasoning that Cleator had no expectation of privacy in his tent. Id. However, it stated that Cleator's privacy expectations, to the extent they existed, were limited to his personal belongings. Id. The stolen items in plain view were not Cleator's personal belongings. Id. at 218. By virtue of the charge the State brought against Wyatt, it contends that the items are Wyatt's personal belongings. See RCW 69.50.401(1). Moreover, the items here were inside closed containers.

Secondly, the Cleator court relied on two cases from other federal circuits for the proposition that Cleator had no reasonable expectation of privacy in his tent, because he had no right to remain on the land. Cleater, 71 Wn. App. at 221 (citing United States v. Ruckman, 806 F.2d 1471, 1472-73 (10th Cir. 1986); Amezquita v. Hernandez-Colon, 518 F.2d 8, 11 (1st Cir.1975)). The Ninth Circuit has since then disagreed with those cases. See United States v. Sandoval, 200 F.3d 659 (9th Cir. 2000). The Sandoval court disagreed with the idea that a defendant's reasonable expectation of privacy turns on whether he had permission to camp on the public land. Id. at 660-61. The Sandoval

11

court considered an illegal camper's privacy rights in a medicine bottle found in a tent on federal land. Id. at 660. The court explicitly disagreed with the majority opinion in Ruckman and held that Sandoval had a subjective expectation of privacy in his tent. Id. at 660, 661 n.4. The court rejected the argument that a person lacks a subjective expectation of privacy because he is engaged in illegal activity or could have expected the police to intrude on his privacy. Id. at 660.

Neither Pentecost nor Cleator resolves the issue currently before us. While touched on in dicta in both cases, Washington courts have not yet determined what Fourth Amendment privacy rights, if any, a defendant has in personal belongings in closed containers found outside an illegal encampment. Wyatt contends that the privacy protections traditionally afforded to containers coupled with the language from Pentecost and Cleator regarding closed containers and personal belongings dictates that he has a reasonable expectation of privacy in the black bag and blue container at his campsite. We agree.

The Fourth Amendment protects people, not places. Katz, 389 U.S. at 351. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection, but what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. Id. Specifically, the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view with the level of protection afforded varying based on the setting. United States v. Ross, 456 U.S. 798, 822-23, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982). The rule applies equally to all containers and there are no "worthy" and "unworthy" containers. Id. at 822 ("[A] traveler who carries a toothbrush and a few articles of clothing

12

in a paper bag or knotted scarf claim an equal right to conceal his possessions from official inspection as the sophisticated executive with the locked attaché case.").

The State contends that concealed items and containers that are not physically found on or nearby a person or near an area regarded as a person's home have been and should remain unprotected. It contends that Wyatt lacked a reasonable expectation of privacy in items stored illegally on public property, in contravention of Kent City Code.

The State relies on State v. Jeffries, 105 Wn.2d 398, 413-14, 717 P.2d 722 (1986) for this assertion. In Jeffries, the court held that a defendant had no expectation of privacy in possessions that he hid in the woods, covered by a tarp and leaves. Id. at 414. The Jeffries court relied on United States v. Pruitt, 464 F.2d 494 (9th Cir. 1972), and reasoned that a search of the items in the woods was lawful, because the defendant could not expect to keep anybody who discovered the items from looking under the tarp and leaves. Id. at 414. In Pruitt, the court likewise held that defendants had no expectation of privacy in boxes of marijuana hidden under trees, covered with underbrush, in a grove of trees located off of a road. 464 F.2d at 495-96. The court specifically opined that the area was not adjacent to a home, that there was no indication that the site of the cache was being occupied as a camp, and that any casual passerby would feel free to ascertain what he had found. Id. at 496.

This case is distinguishable from both Jeffries and Pruitt. The items were not only in closed containers, but also, the items were adjacent to a camp that was clearly occupied. As discussed above, simply because an individual is engaged in illegal activity does not mean that he or she forfeits an expectation of privacy. Sandoval, 200 F.3d at

660. Even though Wyatt was unlawfully camping in the park, he did not forfeit his reasonable expectation of privacy in the closed containers.

We hold that under the Fourth Amendment, Wyatt had a reasonable expectation of privacy in the closed containers found outside his tent. Consequently, the warrantless search of those containers was unconstitutional. The trial court erred when it denied Wyatt's motion to suppress the evidence resulting from the search.

III. Abandonment

Alternatively, the State contends that the search satisfied an exception to the warrant requirement—abandonment. The State contends this is so, because Johnson explicitly disclaimed any interest in the property outside of the tent that she shared with Wyatt. And, Wyatt implicitly agreed with the disclaimer, ostensibly because he did not refute Johnson's statement. The State contends that this disclaimer coupled with Wyatt and Johnson leaving the items at the campsite without attempting to secure them in any way, demonstrates that they intentionally relinquished any expectation of privacy in the items and abandoned them.

The trial court orally opined that "it's probable that [the items were] not abandoned," but it did not enter a conclusion of law on the abandonment issue. It decided that whether or not Wyatt abandoned the items was immaterial in light of its conclusion that Wyatt had no reasonable expectation of privacy in the area anyway. Because we disagree with the trial court's conclusion that Wyatt did not have a reasonable expectation of privacy in the items, we will now consider the State's alternative argument that Wyatt abandoned the containers.

14

The exceptions to the warrant requirement are carefully drawn and the burden rests with the State to prove the presence of an exception. State v. Evans, 159 Wn.2d 402, 407, 150 P.3d 105 (2007). One of the exceptions to the warrant requirement is for voluntarily abandoned property. Id. at 407-08. A determination of voluntary abandonment is generally based upon a combination of act and intent. Id. at 408. The issue is not abandonment in the strict property right sense but, rather, whether the defendant in leaving the property has relinquished his or her reasonable expectation of privacy so that the search and seizure is valid. Id. Where the person has an expectation of privacy, disclaiming ownership of the property is not sufficient, by itself, to constitute abandonment. Id. at 412. The circumstances surrounding the disclaimer of ownership dictate whether a defendant has abandoned his or her property. Id. at 412-413.

Therefore, Johnson's disclaimer of ownership, even if she were able to disclaim ownership on behalf of Wyatt, is not sufficient by itself to find voluntary abandonment by Wyatt. The State contends that, because Johnson's and Wyatt's actions—walking away from the campsite without taking the items or attempting to secure them after the officers told them to remove their things from the park—establishes that they abandoned the property.

However, the officers told Wyatt and Johnson that they had 24 hours to pack their belongings and leave. Wyatt and Johnson were not up against that deadline when they left temporarily. Nothing in the record suggests that they selectively took any personal items when they left, and that those items remaining were those they did not want. Nothing in the record suggests that they were physically capable of removing everything on their backs in one trip if they tried. And, Wyatt and Johnson returned to the camp and

15

spent the night. The items the officers searched while Wyatt and Johnson were away were in approximately the same location when the officers returned the next day. Wyatt and Johnson were still present.

This record will not support a legal conclusion that Wyatt and Johnson abandoned the property which was the subject of the illegal search. The abandonment exception to the warrant requirement does not apply.

IV. Confession

Wyatt contends that the trial court erred when it did not suppress his confession.

Because the warrantless search of Wyatt's containers was unconstitutional, any evidence derived from the illegal search may also be subject to suppression under the fruit of the poisonous tree doctrine. State v. Gaines, 154 Wn.2d 711, 717, 116 P.3d 993 (2005). Under the fruit of the poisonous tree doctrine, evidence is excluded that was derived directly and indirectly from the illegal police conduct. State v. Le, 103 Wn. App. 354, 361, 12 P.3d 653 (2000). Derivative evidence will be excluded unless it was not obtained by exploitation of the initial illegality or by means sufficiently distinguishable to be purged of the primary taint. Id.

Here, the unconstitutional search provided the evidence of manufacturing meth, which provided the basis of the arrest. Therefore, the arrest for investigation of manufacturing meth was illegal. Even if the officers had a basis for Wyatt's arrest for unlawful camping, they had no basis to question him about manufacturing meth other than that obtained from the unconstitutional search.[4] The basis for the questioning that

---

[4] The officers may have had probable cause to arrest Wyatt and Johnson for unlawful camping during their first encounter on October 31 and did not do so. Officer Clay and Sergeant Kelso told Wyatt that he had 24 hours to vacate the campsite. The

led to a confession was exclusively fruit of the illegal search. The resulting confession should have been suppressed.

The trial court erred in denying Wyatt's motion to suppress the evidence in the closed containers and Wyatt's statements after he was arrested. We reverse and remand for further proceedings.[5]

WE CONCUR:

_____

Cox, J.

_____

Becker, J.

---

officers gave Wyatt that warning in the afternoon. 24 hours had not yet elapsed at the time of arrest.

[5] Because we reverse, we do not address Wyatt's argument about his sentence enhancement. We similarly do not address Wyatt's remaining challenges to the trial court's findings of fact and conclusions of law.