156 P.3d 208 (2007)
STATE of Washington, Respondent,
v.
Antoine Robert SURGE, aka "Little Nut"; Christopher T. Yarbrough; Shabray Traysunday McMurry; James McClinton; Ricardo Guzman-Gil; and Allen Lee Bowman, aka Alan Bowman, Petitioners.
No. 76013-6.
Supreme Court of Washington, En Banc.
Argued May 26, 2005.
Decided April 19, 2007.
*210 Gregory Charles Link, Maureen Marie Cyr, Washington Appellate Project, David Bruce Koch, Eric Broman, Eric J. Nielsen, Nielson Broman & Koch PLLC, Seattle, WA, for Petitioners.
Carla Barbieri Carlstrom, King County Prosecutor's Office, Prosecuting Atty. King County, King County Pros/App Unit Supervisor, Seattle, WA, for Respondent.
Douglas B. Klunder, Seattle, for Amicus Curiae on behalf of American Civil Liberties Union.
C. JOHNSON, J.
¶ 1 This case asks us to determine if RCW 43.43.754, a statute authorizing the collection of biological samples for DNA (deoxyribonucleic acid) identification purposes from those convicted of certain crimes, violates article I, section 7 of the Washington State Constitution or the Fourth Amendment. The six petitioners in these consolidated cases were convicted of felonies and, pursuant to the challenged statute, ordered to submit to compulsory DNA sampling. The petitioners appealed the requirement. The Court of Appeals affirmed the trial court's sentencing requirement and held the State's collection of the biological samples constitutes a special need for which a warrant is not required. We affirm the Court of Appeals and hold the compelled collection of DNA from convicted felons does not invade a recognized private affair under the state constitution nor is it prohibited under the Fourth Amendment.

FACTUAL AND PROCEDURAL HISTORY
¶ 2 Petitioner Antoine Surge pleaded guilty to murder in the second degree. Petitioner Christopher Yarbrough was convicted of two counts of robbery and one count of burglary. Petitioner Shabray McMurry was convicted of bailjumping. Petitioner James McClinton pleaded guilty to unlawful possession of cocaine. Petitioner Ricardo Guzman-Gil entered an Alford[1] plea to one count of third degree rape of a child and one count of second degree assault. Petitioner Allen Bowman entered an Alford plea to one count of possession of stolen property in the second degree. Pursuant to the challenged statute, each petitioner was ordered to provide a biological sample for DNA identification analysis and inclusion in the State's DNA database. All six appealed, arguing the compulsory collection of DNA under RCW 43.43.754[2] constituted an unreasonable search under the Fourth Amendment. The Court of Appeals affirmed the requirement, finding the special needs analysis from State v. Olivas, 122 Wash.2d 73, 856 P.2d 1076 (1993) dispositive. State v. Surge, 122 Wash. App. 448, 450, 94 P.3d 345 (2004). The court noted that even if the special needs analysis is no longer valid under federal law, the statute is constitutional under the minimally intrusive search analysis advanced by the concurring opinion in Olivas. All six defendants petitioned this court for review, this time arguing the statute violated their rights under both article I, section 7 and the Fourth Amendment. We granted review at 153 Wash.2d 1008, 111 P.3d 1190 (2005).

*211 ANALYSIS
¶ 3 When presented with arguments under both the state and federal constitutions, we review the state constitution arguments first. State v. Carter, 151 Wash.2d 118, 125, 85 P.3d 887 (2004). Under the Washington Constitution, it is well established that article I, section 7 qualitatively differs from the Fourth Amendment and in some areas provides greater protections than does the federal constitution. State v. McKinney, 148 Wash.2d 20, 29, 60 P.3d 46 (2002). Accordingly, a Gunwall[3] analysis is unnecessary to establish that this court should undertake an independent state constitutional analysis.[4]State v. Jackson, 150 Wash.2d 251, 259, 76 P.3d 217 (2003); McKinney, 148 Wash.2d at 26, 60 P.3d 46. The only relevant question is whether article I, section 7 affords enhanced protection in the particular context. McKinney, 148 Wash.2d at 26-27, 60 P.3d 46.

Article I, Section 7
¶ 4 Article I, section 7 reads, "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." The language of article I, section 7 requires a two-part analysis. We begin by determining whether the action complained of constitutes a disturbance of one's private affairs. If there is no private affair being disturbed, no article I, section 7 violation exists. If a valid privacy interest has been disturbed, the second step in our analysis asks whether authority of law justifies the intrusion. In general terms, the "authority of law" required by article I, section 7 is satisfied by a valid warrant. However, the protections of article I, section 7 and the authority of law inquiry are triggered only when a person's private affairs are disturbed or the person's home is invaded. Carter, 151 Wash.2d at 126, 85 P.3d 887.
¶ 5 The "private affairs" inquiry focuses on "`those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant.'" State v. Young, 123 Wash.2d 173, 181, 867 P.2d 593 (1994) (quoting State v. Myrick, 102 Wash.2d 506, 511, 688 P.2d 151 (1984)). Private affairs are not determined according to a person's subjective expectation of privacy because looking at subjective expectations will not identify privacy rights that citizens have held or privacy rights that they are entitled to hold. We begin by examining the historical treatment of the interest asserted, which may disclose that the interest is one a citizen has held. McKinney, 148 Wash.2d at 27, 60 P.3d 46. For example, in Gunwall, we relied in part on a statute first enacted in 1909 to establish the historical treatment of the interest asserted in that case. If history does not show whether the interest is one entitled to protection under article I, section 7, we then turn to the question whether the expectation is one that a citizen of this state is entitled to hold. McKinney, 148 Wash.2d at 29, 60 P.3d 46. This part of the inquiry includes looking at the nature and extent of the information which may be obtained as a result of the governmental conduct. McKinney, 148 Wash.2d at 27-29, 60 P.3d 46. The extent to which the information has been voluntarily exposed to the public is also a consideration because it may show, objectively, that there is no expectation of privacy.
¶ 6 In this case, the "private affairs" inquiry focuses on a convicted felon's asserted privacy interest in his or her identity, not on the privacy interests of the ordinary citizen. The distinction is important to our inquiry because the statute involved in this case applies only to the narrow class of individuals who have been convicted of the listed crimes, and the focus must be on their rights.
*212 ¶ 7 The State argues that convicted felons have always had a diminished privacy interest in their identity. The State points out that upon conviction, the defendant's name, date of birth, physical features, race, distinguishing scars or tattoos, and fingerprints all become part of the person's criminal history and this information is maintained as to these individual identifying characteristics. The State contends that DNA sampling,[5] which further identifies a defendant, is no more of an intrusion into the defendant's privacy rights than collecting fingerprints or other identifying data. As to monitoring this information for further use, the State points out that fingerprints are filed and regularly compared to fingerprints found at crime scenes or used to identify bodies with no other means of identification. The State notes that the constitutionality of any of the above identification requirements is unchallenged and that no case or statute exists recognizing a heightened privacy interest held by convicted felons in these identifying requirements.
¶ 8 Petitioners argue article I, section 7 provides greater protection in all warrantless search situations and no exceptions apply. Petitioners' argument assumes ordinary citizens and convicted felons enjoy the same privacy interests under the state constitution and, therefore, our article I, section 7 analysis will not vary based on the status of a petitioner. Petitioners rely on one sentence in State v. Simpson, 95 Wash.2d 170, 622 P.2d 1199 (1980), to assert article I, section 7 recognizes an individual's right to privacy with no express limitations and, therefore, any invasion into a person's privacy requires either a warrant or a narrowly drawn exception to the warrant requirement.
¶ 9 Petitioners read Simpson too broadly. In Simpson, we focused our analysis on the Fourth Amendment to find the challenged search unreasonable. Also, in State v. Cheatam, 150 Wash.2d 626, 81 P.3d 830 (2003), we declared article I, section 7 recognized an individual's right to privacy with no express limitations, but explicitly analyzed Cheatam's claim under state constitutional principles, and found Cheatam, as an arrestee, had lost any privacy interest in his personal items that had already been lawfully exposed to police view. Thus, while article I, section 7 does not expressly limit the right to privacy, not every asserted right qualifies as a "private affair." We still analyze the interest under state constitutional principles to determine if a valid privacy interest exists.
¶ 10 We find the petitioners' arguments unpersuasive for two additional reasons. First, the constitutional rights afforded to a person often depend on his or her status. In Washington, a person's privacy rights under article I, section 7 may vary based on that person's status as an arrestee, pretrial detainee, prisoner, or probationer. See, e.g., Cheatam, 150 Wash.2d at 642, 81 P.3d 830 (holding an arrestee loses any privacy interest in personal items already searched and stored pursuant to a valid inventory search). See also Charles W. Johnson, Survey of Washington Search and Seizure Law: 2005 Update, 28 SEATTLE U.L.REV. 467, 689-92 (2005) (discussing how incarcerations and convictions diminish search and seizure protections).
¶ 11 Further, petitioners assume they have a valid privacy interest in their identities under article I, section 7 and begin their analysis with the second step of our two-step inquiry, whether authority of law exists for the search. As stated above, we reach the second step of the analysis only after we have found a valid private affair has been disturbed.
¶ 12 Here, we do not find a private affair has been disturbed because collecting identifying information from convicted felons does not infringe on a privacy interest that convicted felons of this state have held, or should be entitled to hold, safe from government trespass. It is a well established practice of government to collect fingerprints from convicted felons for identification purposes. We find no distinction between that practice and the collection of DNA. In this case, the collection of identifying information authorized by the statute is limited to the same purposes as fingerprints, photos, or other identifying information. Under RCW 43.43.754, the purpose of collecting a DNA *213 sample is for identification only, which does not constitute a disturbance of their private affairs. Because no private affair is implicated, we need not reach the second step of the inquiry  whether authority of law exists for the search.
¶ 13 Petitioners further contend the Court of Appeals erred in relying on the special needs approach and the traditional balancing test because those tests conflict with our article I, section 7 jurisprudence. First, petitioners assert a warrantless search justified by a special need traditionally does not rely on any level of individualized suspicion. Without individualized suspicion, the petitioners, citing Kuehn v. Renton School District No. 403, 103 Wash.2d 594, 599, 694 P.2d 1078 (1985), maintain the search is general and, therefore, categorically unauthorized.
¶ 14 The search in Kuehn, where school officials searched the luggage of a group of students, is easily distinguished from the searches challenged here. We held the students had a valid privacy interest in their luggage, which, even assuming a lessened expectation of privacy, required at least a reasonable belief the students' luggage contained contraband. Conversely, petitioners here retain almost no privacy interest in their identity. Upon conviction, they lose the privilege of keeping their identity from becoming part of a government record. The State already collects from convicted persons identifying information such as photographs and fingerprints; a DNA sample is simply another piece of identifying information routinely collected. Individualized suspicion is not required for the government to obtain and record the identity of a person convicted of a crime.
¶ 15 Petitioners also rely on Seattle v. Mesiani, 110 Wash.2d 454, 755 P.2d 775 (1988), and City of Seattle v. McCready, 123 Wash.2d 260, 868 P.2d 134 (1994), to support their contention that this court has repeatedly struck down statutes authorizing searches without individualized suspicion even though the purpose of the searches could be considered a special need. In Mesiani, we found a sobriety checkpoint program unconstitutional under article I, section 7, and we acknowledged a citizen does not lose any reasonable expectation of privacy simply by traveling in an automobile. Mesiani, 110 Wash.2d at 456-57, 755 P.2d 775. Thus, the petitioners in Mesiani were entitled to a full privacy interest under article I, section 7. By contrast, a citizen does lose some expectation of privacy by the fact of conviction and incarceration.
¶ 16 In McCready, the nonconsensual inspection of residential apartments was conceded by the City of Seattle to be a disturbance of "private affairs" under article I, section 7. Accordingly, we focused our analysis on whether there was authority of law to justify the searches. McCready, 123 Wash.2d at 271, 868 P.2d 134. The ordinary citizen status of the petitioners in McCready entitled them to the full privacy protections of article I, section 7. Here, in contrast, the petitioners were convicted of felonies and sentenced to a term of confinement. Their privacy expectations are significantly reduced, particularly in their identities.
¶ 17 Moreover, petitioners contend the appellate court erred in its balancing of the rights of petitioners against the government's interest. They quote from our Mesiani opinion "`[t]he easiest and most common fallacy in "balancing" is to place on one side the entire, cumulated "interest" represented by the state's policy and compare it with one individual's interest in freedom from the specific intrusion on the other' . . . A fairer balance would weigh the actual expected alleviation of the social ill against the cumulated interests invaded." Mesiani, 110 Wash.2d at 459, 755 P.2d 775 (quoting State v. Tourtillott, Or. 845, 881, 289 Or. 845, 618 P.2d 423 (1980) (Linde, J., dissenting)). Petitioners maintain the cumulated interest invaded here includes the privacy interest of any person who has a prior felony conviction, even if that person has served his or her term of confinement, as well as the privacy interest of a person currently serving a sentence for a felony conviction. Petitioners argue the privacy rights of a person who has served his or her sentence for a felony conviction are no longer diminished. Thus, they conclude, the diminished privacy right argument does not apply to the entire class of persons the statute targets. We disagree.
*214 ¶ 18 On its face, the statute applies only to those convicted of the enumerated crimes who are still incarcerated. RCW 43.43.754(4).[6] As the petitioners recognize in their brief, present incarceration diminishes a person's privacy interest. Although the records are permanently maintained, this is true of the other identifying information collected from one convicted of a crime. Just as a person convicted of a felony who has served out his or her sentence normally cannot expunge his or her other identifying information from existing government records, the permanent retention of the DNA sample likewise does not violate a privacy interest.
¶ 19 The State has established that DNA extraction under RCW 43.43.754 is analogous to the routine collection of fingerprints, photographs, and other vital statistics from convicted felons in the context of state constitution privacy concerns. These comparable requirements are so engrained in our traditional criminal procedure that they have not been subject to constitutional challenge.
¶ 20 Finally, petitioners argue their DNA has the potential to provide more than just identifying information and this additional information constitutes a disturbance of their private affairs. While we recognize the validity of petitioners' concerns, we feel they are adequately addressed by the statute itself. The statute at issue expressly limits the use of DNA samples to "identification analysis and prosecution of a criminal offense or for the identification of human remains or missing persons." RCW 43.43.754(2). This limited purpose is also found in the administrative code which governs chapter 43.43 RCW. The use of the DNA identification systems is restricted to three purposes: (1) identification of possible suspects, (2) data banking for convicted felons, and (3) identifying human remains or missing persons. WAC 446-75-030. The use of DNA for "any research or other purpose not related to a criminal investigation, to identification of human remains or missing persons, or to improving the operation of the system established by the Washington state patrol and authorized by RCW 43.43.752 through 43.43.759" is prohibited. WAC 446-75-080. Because the statute narrowly defines its purpose as the production of identifying information and this type of information has traditionally not been recognized as a protected interest of convicted felons, we find there is no disturbance of the defendants' private affairs under article I, section 7.
¶ 21 Additionally, the concurrence in dissent (Fairhurst, J.) erroneously cites to cases to support its assertion that, here, a privacy interest exists under article I, section 7. In fact, none of the cases cited in the concurrence in dissent (Fairhurst, J.) supports an article I, section 7 analysis where the class of persons involved is convicted felons who are incarcerated. For example, In re Juveniles A, B, C, D, E, 121 Wash.2d 80, 96, 847 P.2d 455 (1993) is cited for the proposition that we recognize two types of privacy interests under article I, section 7. However, a close reading of the case reveals that not only was In re Juveniles A, B, C, D, E decided under Fourth Amendment jurisprudence, but the types of privacy interests referred to originate from Fourteenth Amendment jurisprudence right to privacy, not article I, section 7.[7]
¶ 22 Here, we deal with convicted felons who have, under any form of analysis, a minimal privacy interest in their identities. The analogy to fingerprinting is extremely persuasive in that both DNA typing and fingerprinting impinge on similar privacy interests. The constitutionality of fingerprinting convicted persons is unquestioned. See *215 State v. Olivas, 122 Wash.2d 73, 106, 856 P.2d 1076 (1993) (Utter, J., concurring).
¶ 23 Insofar as the use to which the DNA typing results can be put is concerned, the statute does not permit, as we have explained, any use other than for identity purposes. It does not authorize, therefore, an impermissible invasion of bodily integrity through, for example, disclosure of medical conditions or similar information, and there is no basis to conclude that samples contained in these cases have been used for any improper purpose. Therefore, contrary to the view of the dissenting opinions, the statute does not unconstitutionally authorize disturbance of an individual's bodily integrity by allowing the DNA results to be used for purposes other than identity.
¶ 24 The minimally invasive procedure involved under this statute is constitutional under article I, section 7 in any event. As prisoners, petitioners' privacy interests are diminished, and the same interests that justify use of their DNA for identity purposes justify the minimally invasive procedures used to obtain the DNA.

Fourth Amendment
¶ 25 Having determined RCW 43.43.754 does not violate article I, section 7, we now analyze if the statute violates the minimum protections afforded under the Federal Constitution. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides this right "shall not be violated, and no warrants shall issue, but upon probable cause . . ." U.S. Const. amend. IV. Petitioners acknowledge this court has affirmed the constitutionality of former RCW 43.43.754 (1990), the challenged statute's predecessor, in Olivas, 122 Wash.2d 73, 856 P.2d 1076. Former RCW 43.43.754 required DNA collection from individuals convicted of a felony sexual offense or felony violent offense. In finding the statute did not violate the Fourth Amendment in Olivas, we engaged in a special needs analysis. Under this approach, a departure from traditional warrant and probable cause requirements may be justified if the government has a special need beyond normal law enforcement. We found the DNA database would act as a deterrent to recidivism and, thus, the statute's purpose was not for "normal" law enforcement. Olivas, 122 Wash.2d at 92-93, 856 P.2d 1076. Petitioners assert Olivas is no longer good law in light of two intervening United States Supreme Court opinions clarifying the scope of the special needs doctrine.
¶ 26 First, in City of Indianapolis v. Edmond, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), the Court invalidated a highway checkpoint program whose primary purpose was the discovery and interdiction of drugs because the primary purpose was indistinguishable from a general interest in crime control. The Court stated they were "particularly reluctant to recognize exceptions to the general rule of individualized suspicion where governmental authorities primarily pursue their general crime control ends." Edmond, 531 U.S. at 43, 121 S.Ct. 447. Then again, in Ferguson v. City of Charleston, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001), the Court affirmed the limited nature of the special needs doctrine when it struck down a state hospital program that tested pregnant women for drug use and made the results of the test available for police use. While the Court found a significant goal of the program was to protect the health of both the mother and the child, the Court noted "the immediate objective of the searches was to generate evidence for law enforcement purposes. . . ." Ferguson, 532 U.S. at 83, 121 S.Ct. 1281. Finally, petitioners rely on United States v. Kincade, 345 F.3d 1095 (9th Cir.2003), where two judges of the three judge panel held forced blood extractions under the federal DNA statute violated the Fourth Amendment. The court relied on both Edmond and Ferguson as intervening law to reach this conclusion. By the time petitioners' case reached this court, the Kincade opinion had been vacated and reversed by the Ninth Circuit sitting en banc. United States v. Kincade, 379 F.3d 813 (9th Cir.2004), cert. denied sub nom. Kincade v. United States, 544 U.S. 924, 125 S.Ct. 1638, 161 L.Ed.2d 483 (2005). The en banc court declined to find the special needs analysis invalid in light of Edmonds and Ferguson, *216 although it relied on a totality of the circumstances analysis instead. Kincade, 379 F.3d at 832. In addition to the en banc Ninth Circuit opinion, the federal courts which addressed the constitutionality of DNA sampling statutes found the statutes in accord with the Fourth Amendment. Padgett v. Donald, 401 F.3d 1273, 1278 (11th Cir. 2005), cert. denied sub nom. Boulineau v. Donald, ___ U.S. ___, 126 S.Ct. 352, 163 L.Ed.2d 61 (2005).
¶ 27 The State urges this court to apply the totality of the circumstances approach as outlined by the concurring opinion in Olivas. In the concurring opinion, after making a threshold finding that blood extractions are a minimal intrusion, Justice Utter would have balanced the government's need for a DNA database, the degree to which the testing serves that need, and the burden the testing imposes on individual privacy. Olivas, 122 Wash.2d at 104, 856 P.2d 1076. Justice Utter found this approach superior to the special needs analysis used by the majority because it conditioned the constitutionality of the statute on the class of persons being tested, it recognized the close fit between the purpose of the statute and the testing taking place, and he feared the use of special needs balancing in the context of law enforcement would lead to the eventual balancing away of the traditional warrant requirement whenever a strong governmental need was present. Olivas, 122 Wash.2d at 107-08, 856 P.2d 1076. In the alternative, the State contends the special needs analysis of Olivas is still viable and distinguishes Edmond and Ferguson as involving the privacy interests of ordinary citizens who, unlike the petitioners here, enjoyed the full array of protections under the Fourth Amendment.
¶ 28 We find nothing in the federal cases which calls into question our analysis in Olivas under either the majority's special needs approach or the concurrence's balancing approach. Certainly the concurring opinion in Olivas is more consistent with our cases interpreting article I, section 7. But under either approach, no cases support the conclusion that DNA sampling from persons convicted of felonies violates the Fourth Amendment.

CONCLUSION
¶ 29 We find RCW 43.43.754 does not violate article I, section 7 or the Fourth Amendment. We affirm the Court of Appeals.
WE CONCUR: GERRY L. ALEXANDER, C.J, BARBARA A. MADSEN, J.
CHAMBERS, J. (concurring).
¶ 30 I largely concur. Convicted felons do have a diminished privacy interest in their identifying information. State v. Olivas, 122 Wash.2d 73, 106, 856 P.2d 1076 (1993) (Utter, J., concurring). I write separately to caution that to the extent that RCW 43.43.754 purports to require misdemeanants to submit to DNA (deoxyribonucleic acid) testing, it may violate article I, section 7 of the Washington Constitution. More importantly, even felons may have an enforceable privacy interest in their DNA if it is used for something other than mere identification.
¶ 31 Critically, the statute we are asked to review specifically limits the use of DNA to identification purposes. RCW 43.43.754(2) ("Any biological sample . . . shall be used solely . . . for identification analysis and prosecution.") Like our facial features recorded on a photograph or our fingerprints left on a windowpane, the uniqueness of our individual DNA provides an effective identification tool. However, our individual DNA can provide much more than that, including information about our ancestry, our medical future, and even information about our biological family members. Each of us, including convicted felons, holds a deep and abiding privacy interest in much of this information. I confess concern that the government, and others with access to government information, will be unable to resist the temptation to use the DNA gathered today under this statute for purposes other than identification.
¶ 32 However, the statute clearly limits the government's use of DNA to identification purposes. Should the State use or permit others to use DNA gathered pursuant to this statute in any manner other than that permitted by the current statute, the State may *217 well overstep its constitutional authority and be accountable to anyone aggrieved.
¶ 33 I respectfully concur in result.
OWENS, J. (concurring in the result).
¶ 34 While I agree with the majority's conclusion that the compulsory collection of deoxyribonucleic acid (DNA) samples from convicted felons does not violate article I, section 7 of the Washington State Constitution or the fourth amendment to the federal constitution, I find the majority's method for addressing the state and federal constitutional claims flawed.
¶ 35 Although the majority correctly acknowledges that "in some areas" article I, section 7 is more protective than the Fourth Amendment, majority at 211 (emphasis added), the majority does not tell us how we are to know when the state constitutional protection is in fact broader. Rather, the majority analyzes the constitutionality of RCW 43.43.754 first under article I, section 7 and then under the Fourth Amendment. The majority never attempts to explain why an analysis under both the state and federal provisions would ever be necessary. Logically, if the state constitution affords broader protection, there can be no need to proceed under the Fourth Amendment, and conversely, if the state constitution is not more protective, the Fourth Amendment's protections will necessarily be coextensive with our state constitutional protections, making a state constitutional analysis redundant.
¶ 36 The majority's mistaken notion that this court must engage in both "an independent state constitutional analysis" and a federal constitutional analysis betrays the majority's misunderstanding of this court's important holding in State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986). Majority at 211. The majority opinion actually leaves us where the Gunwall court started, as can be seen from the Gunwall court's first issue statement: "When is it appropriate for this court to resort to independent state constitutional grounds to decide a case, rather than deferring to comparable provisions of the United States Constitution as interpreted by the United States Supreme Court?" Id. at 58, 720 P.2d 808 (emphasis added). The Gunwall court's mission was to provide a principled way to determine when the state constitution is more protective in a given situation and when, consequently, an independent state analysis is warranted. Providing background on the genesis of that issue, the Gunwall court quoted the following passage from Justice Utter's law review article:
"Washington is one of many states that rely on their own constitutions to protect civil liberties. Since the recent retrenchment of the United States Supreme Court in this area, the appellate courts of a majority of the states have interpreted their state constitutions to provide greater protection for individual rights than does the United States Constitution."
Id. at 59, 720 P.2d 808 (emphasis added) (quoting Justice Robert F. Utter, Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights, 7 U. PUGET SOUND L.REV. 491, 499 (1984)). To determine "[w]hen" our state constitution is to be interpreted as providing "`greater protection for individual rights'" than the federal constitution, id. at 58, 59, 720 P.2d 808 (emphasis added), the Gunwall court set forth six "nonexclusive neutral criteria . . . relevant in determining whether, in a given situation, the Washington State Constitution should be considered as extending broader rights to its citizens than the United States Constitution." Id. at 58, 720 P.2d 808 (emphasis added); see also id. at 61, 720 P.2d 808 (reiterating that the six factors are "relevant to determining whether, in a given situation, the constitution of the State of Washington should be considered as extending broader rights to its citizens than does the United States Constitution" (emphasis added)).
¶ 37 In sum, although the majority rightly acknowledges that article I, section 7 may provide greater protection of individual rights than the Fourth Amendment, the majority nevertheless ignores the Gunwall court's six-factor inquiry and retreats to square one. Whereas the Gunwall court proposed a method for answering the question, the majority's amnesic approach in the *218 present case is to provide a state constitutional analysis and then a federal analysis. One of the majority's analyses is redundant, but the majority has no idea which one that might be.
¶ 38 That the majority embarks on an article I, section 7 analysis without considering the Gunwall factors could logically suggest that the majority believes that anytime a party claims a violation of article I, section 7 and the Fourth Amendment, our state constitution will provide broader protection. Such a notion is insupportable. This court has held that the analysis of Gunwall factors one, two, three, and five will not vary with the context giving rise to the article I, section 7 claim and that those factors will invariably weigh in favor of declaring article I, section 7 more protective than the Fourth Amendment.[1] Additionally, we have held that Gunwall factors four and six  "preexisting state law" and "matters of particular state or local concern"  are necessarily contingent on the particular context of the claimed constitutional violation,[2] and we have acknowledged, as common sense dictates, that where we have already assessed factors four and six "in a particular context," we need not replicate the analysis but may rely on our past decisions.[3] For example, because we have frequently addressed article I, section 7 in the context of warrantless vehicle searches and stops, the analysis of Gunwall factors four and six is now superfluous in that context.[4] Here, however, given that we have never determined whether article I, section 7 is more protective than the Fourth Amendment in the particular context of DNA samples taken from convicted felons, the majority implicitly overrules Gunwall.
¶ 39 Moreover, although the majority asserts that "an independent state constitutional analysis" is warranted, majority at 211 (emphasis added), the majority nonetheless contradicts that contention by following the article I, section 7 analysis with a Fourth Amendment analysis: "Having determined RCW 43.43.754 does not violate article I, section 7, we now analyze if the statute violates the minimum protections afforded under the federal constitution." Majority at 215. Again, why do that? The purpose of applying the Gunwall factors is to determine whether article I, section 7 is broader in scope. If, as the majority apparently contends, article I, section 7 provides more protection to these petitioners than does the Fourth Amendment but still not enough to preclude the State's collection of their DNA samples, it is plainly illogical to proceed as though a less protective Fourth Amendment would produce a different result. Either article I, section 7 is broader, in which case an independent state analysis resolves the constitutional claims, or it is not broader and a *219 Fourth Amendment analysis will thus resolve the coextensive state and federal claims.
¶ 40 In sum, I would plainly state that we have not previously considered the relative scope of article I, section 7 and the Fourth Amendment in the context of the compulsory collection of DNA samples from felons, and I would conclude that Gunwall factors four and six do not establish that article I, section 7 is more protective than the Fourth Amendment and that, consequently, an independent analysis under article I, section 7 is unwarranted. Cf. Audley, 77 Wash.App. at 904, 894 P.2d 1359 (concluding that, based on Gunwall factors four and six, article I, section 7 "affords no greater protection to an arrestee from warrantless bodily searches than the federal constitution" and that no independent state constitutional analysis is warranted). In contrast to the majority's confusing, equivocal approach, I would rely solely on a Fourth Amendment analysis. I would apply the traditional balancing test for minimally intrusive searches and would hold that the compulsory collection of DNA samples from convicted felons does not constitute an unreasonable search barred by the Fourth Amendment.
¶ 41 Finally, even if the majority had defensibly embarked on an independent article I, section 7 analysis, I would join Justices Fairhurst and Sanders in rejecting the majority's handling of that analysis. See dissent at 220-21; concurrence in dissent (Fairhurst, J.) at 211. Two inquiries are implicit in an article I, section 7 claim: (1) whether the contested state action "disturbed" a person's "private affairs" and, if so, (2) whether the action was undertaken with "authority of law" (that is, pursuant to a validly issued warrant, an exception to the warrant requirement, or a constitutional statute). The majority actually folds the second inquiry into the first and determines that the compulsory collection of a biological sample was not state action that "disturbed" the petitioners' "private affairs." That conclusion is not only intuitively implausible, it is contrary to prior case law, as Justices Fairhurst and Sanders explain. Id. The blood draw and DNA analysis assuredly constitute an intrusion into the petitioners' "private affairs." The majority should have recognized as much and should have directed its article I, section 7 analysis to the second inquiry, the validity of that intrusion.[5]
WE CONCUR: Justice BOBBE J. BRIDGE.
SANDERS, J. (dissenting).
¶ 42 The majority concludes RCW 43.43.754, which requires convicted felons to provide a biological sample for DNA testing, does not disturb a private affair protected by article I, section 7 of the Washington Constitution. I disagree. Collection of a biological sample is a search. And every search conducted by a state agent implicates a private affair protected by article I, section 7.

A Person's Body is Among Their "Private Affairs"
¶ 43 "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." WASH. CONST. art. I, § 7.
¶ 44 Under RCW 43.43.754, persons convicted of certain felonies must provide a biological sample for DNA (deoxyribonucleic acid) testing.[1] The majority concludes collecting biological samples from convicted felons cannot violate article I, section 7 because it is not "a disturbance of their private affairs." Majority at 212-13. The majority is incorrect.
¶ 45 The majority's error is simple, but fundamental. It contends collecting these biological samples disturbed no "private affairs" because these prisoners lack "a valid privacy interest in their identities under article *220 I, section 7." Majority at 212. Perhaps. But they do not claim a privacy interest in their identities. They claim a privacy interest in their bodies. And that is not yet forfeited.
¶ 46 The "private affairs" protected by article I, section 7 include every privacy interest protected by the Fourth Amendment. "It is by now axiomatic that article I, section 7 provides greater protection to an individual's right of privacy than that guaranteed by the Fourth Amendment" and "necessarily encompasses those legitimate expectations of privacy protected by the Fourth Amendment." State v. Parker, 139 Wash.2d 486, 493-94, 987 P.2d 73 (1999). A Fourth Amendment search occurs whenever a government agent invades a person's "reasonable expectation of privacy." California v. Greenwood, 486 U.S. 35, 41, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988). But article I, section 7 is "not confined to the subjective privacy expectations of modern citizens who . . . are learning to expect diminished privacy in many aspects of their lives." State v. Myrick, 102 Wash.2d 506, 511, 688 P.2d 151 (1984). An article I, section 7 search occurs whenever a state agent invades "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant," irrespective of a person's subjective expectations. Id. In other words, while the Fourth Amendment protects subjective expectations of privacy, article I, section 7 protects objective privacy interests.
¶ 47 First among those privacy interests is a person's body. See Schmerber v. California, 384 U.S. 757, 770, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). "A man's home is his castle." State v. Young, 76 Wash.2d 212, 214, 455 P.2d 595 (1969). But his body is his temple. "If any thing is sacred, the human body is sacred." WALT WHITMAN, "I Sing the Body Electric" in LEAVES OF GRASS (1900). Prisoners lose their privacy interest in "private affairs" lawfully exposed to state agents. State v. Cheatam, 150 Wash.2d 626, 642, 81 P.3d 830 (2003) (holding prisoner lacks privacy interest in personal items lawfully searched and stored by prison). Accordingly, they may indeed have "a diminished privacy interest in their identity." Majority at 211. But their privacy interest in their body is neither lost nor diminished. Because article I, section 7 "is implicated" whenever a state agent "conducts a search," State v. Young, 123 Wash.2d 173, 181, 867 P.2d 593 (1994), every "search" by definition disturbs a person's "private affairs." Collecting a biological sample is "indisputably" a Fourth Amendment search. Ferguson v. City of Charleston, 532 U.S. 67, 76, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001). See also Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 616-18, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (holding collection and analysis of biological samples both Fourth Amendment searches). And it is an article I, section 7 search as well. See State v. Curran, 116 Wash.2d 174, 184, 804 P.2d 558 (1991) (holding blood test an article I, section 7 "search and seizure"). Accordingly, collecting a biological sample necessarily disturbs a "private affair" protected by article I, section 7.
¶ 48 A person's body is cardinal among the "private affairs" protected by article I, section 7. And the right to preserve the integrity of one's body is fundamental. Prisoners may object to the invasion of their person, or they may object to nothing.
¶ 49 The majority contends the State may collect biological samples from prisoners because their privacy interests are diminished. But as Judge Reinhardt recently observed, under this rationale "any person who experiences a reduction in his expectation of privacy would be susceptible to having his blood sample extracted" and included in a DNA registry. United States v. Kincade, 379 F.3d 813, 844 (9th Cir.2004) (Reinhardt, J., dissenting). While DNA databanks certainly facilitate effective law enforcement, effectiveness is no guarantee of constitutionality. Individual rights always pale in comparison to societal needs. But it is the ultima ratio of tyranny to claim "you can't make an omelet without breaking eggs." Walter Duranty, Russians Hungry, But Not Starving, N.Y. TIMES Mar. 31, 1933, at 13.[2] We trust in *221 our constitutions not in spite of their impracticalities, but because of them. Those impracticalities are our protections. We surrender them at our peril.
¶ 50 I dissent.
FAIRHURST, J. (concurring in the dissent)
¶ 51 The majority frames Antoine Surge's privacy interest as being limited to his identity and, therefore, it holds that article I, section 7 does not apply. The majority is incorrect. Prison officials knew Surge's identity when he was committed to their custody. Rather than identity, this case involves the nonconsensual taking of Surge's blood to test his deoxyribonucleic acid (DNA), which unquestionably intrudes on his privacy interest in autonomous decision making under article I, section 7. In re Juveniles A, B, C, D, E, 121 Wash.2d 80, 96-98, 847 P.2d 455 (1993); State v. Curran, 116 Wash.2d 174, 184, 804 P.2d 558 (1991); Robinson v. City of Seattle, 102 Wash.App. 795, 817, 10 P.3d 452 (2000). I write separately to explain the test I would apply to determine whether the State's intrusion was conducted under authority of law.
¶ 52 When the State intrudes on an individual's autonomous decision making privacy interest under article I, section 7, we must determine whether the intrusion was conducted under authority of law. Robinson, 102 Wash.App. at 813, 10 P.3d 452. In a law enforcement context, an intrusion is valid only if the State has a warrant or meets one of the recognized exceptions to the warrant requirement. Id. at 816, 10 P.3d 452 (citing State v. Farmer, 116 Wash.2d 414, 429-30, 805 P.2d 200, 812 P.2d 858 (1991)). Outside the law enforcement context, this court applies a two-part narrowly tailored compelling state interest test to determine whether state intrusions of autonomous decision making privacy interests were conducted under authority of law. See Juveniles, 121 Wash.2d at 97-98, 847 P.2d 455; Farmer, 116 Wash.2d at 430-31, 805 P.2d 200; Robinson, 102 Wash.App. at 816-18, 10 P.3d 452. The State must show that it has a compelling interest in intruding on the individual's privacy interest and that the intrusion was narrowly tailored to achieve that interest. Juveniles, 121 Wash.2d at 97-98, 847 P.2d 455. The intrusion in this case is outside the law enforcement context because, although a felon's DNA is likely to be used by law enforcement for future prosecutions once recorded in the State's DNA database, the purpose for which it is extracted under RCW 43.43.754 is unrelated to a current criminal prosecution. Therefore, we apply the narrowly tailored compelling state interest test.
¶ 53 In Juveniles, we found state interest in mandatory human immunodeficiency virus (HIV) testing of juvenile sexual offenders compelling because it "protects society from a communicable disease, safeguards the interests of victims, [and] facilitates the efficient operation of prisons."[1] 121 Wash.2d at 97-98, 847 P.2d 455. We also found mandatory HIV testing of sexual offenders narrowly tailored because it is "aimed at a high-risk group" and "limits disclosure of test results." Id. at 98, 847 P.2d 455.
*222 ¶ 54 In contrast, the State has not established a compelling state interest or narrow tailoring in this case. State interest in identifying Surge is not compelling because the State already knows his identity. RCW 43.43.754 is not narrowly tailored because it is now aimed at all felons, not just certain high-risk offenders. LAWS OF 2002, ch. 289, § 2; RCW 43.43.754(1). Prior to July 1, 2002, RCW 43.43.754 applied only to adults and juveniles convicted or adjudicated guilty of sexual or violent crimes. Former RCW 43.43.754 (1989). As of July 1, 2002, the statute was extended to apply to adults and juveniles convicted or adjudicated guilty of any felony, stalking under RCW 9A.46.110, harassment under RCW 9A.46.020, or communicating with a minor for immoral purposes under RCW 9.68A.090. RCW 43.43.754(1), (4).
¶ 55 I would conclude that the State intruded on Surge's privacy interest in his body and bodily functions and the intrusion was not conducted under authority of law because the State did not have a narrowly tailored compelling interest. I concur in the dissent.
NOTES
[1] North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).
[2] RCW 43.43.754 applies to "[e]very adult or juvenile individual convicted of a felony, stalking under RCW 9A.46.110, harassment under RCW 9A.46.020, communicating with a minor for immoral purposes under RCW 9.68A.090, or adjudicated guilty of an equivalent juvenile offense. . . ." RCW 43.43.754. Thus, the statute applies to certain gross misdemeanors as well as to felonies.
[3] State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986) (setting forth the factors for evaluating whether an issue merits independent state constitutional interpretation).
[4] We have said while the structural differences in federal and state constitutions means the federal analysis is not binding upon our state constitutional analysis, it can still guide us because both recognize similar constitutional principles; the structural differences in state and federal constitutions may require a different analytical approach. That does not mean, however, that our result will always be inconsistent with the United States Supreme Court. State ex rel. Gallwey v. Grimm, 146 Wash.2d 445, 482, 48 P.3d 274 (2002).
[5] The method of securing a DNA sample is not challenged by the petitioners.
[6] The statute reads, in pertinent part, "[t]his section applies to all adults and juveniles who are convicted of [the enumerated crimes], on or after July 1, 2002; and to all adults and juveniles who were convicted or adjudicated guilty of such an offense before July 1, 2002, and are still incarcerated on or after July 1, 2002." (Emphasis added.)
[7] In re Juveniles A, B, C, D, E, 121 Wash.2d at 96, 847 P.2d 455 (recognizing two types of privacy interests) citing O'Hartigan v. Dep't of Personnel, 118 Wash.2d 111, 117, 821 P.2d 44 (1991) (asserting the United States Supreme Court has identified two types of interests protected by the right to privacy) (citing Whalen v. Roe, 429 U.S. 589, 599-600, 97 S.Ct. 869, 51 L.Ed.2d 64, (1977) (quoting Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705 35 L.Ed.2d 147, (1973))).
[1] See State v. Boland, 115 Wash.2d 571, 576, 800 P.2d 1112 (1990) (adopting the Gunwall court's analysis of factors one, two, three, and five, "[s]ince Gunwall involved comparing the same constitutional provisions").
[2] Gunwall, 106 Wash.2d at 58, 68, 720 P.2d 808. See State v. Russell, 125 Wash.2d 24, 58, 882 P.2d 747 (1994) (noting that Gunwall factors four and six "are generally unique to the context in which the interpretation question arises," thus requiring the court to "examine[] the fourth and sixth factors in light of the new context presented" (emphasis added)); State v. Audley, 77 Wash. App. 897, 903, 894 P.2d 1359 (1995) (observing that the fourth and sixth Gunwall factors will "vary depending on the state action being challenged").
[3] See Murphy v. State, 115 Wash.App. 297, 311, 62 P.3d 533 (2003) (stating that "just because a state constitutional provision has been subject to independent interpretation and found to be more protective in a particular context, it does not follow that greater protection is provided in all contexts"), cert. denied, 541 U.S. 1087, 124 S.Ct. 2812, 159 L.Ed.2d 249 (2004); State v. Reichenbach, 153 Wash.2d 126, 131 n. 1, 101 P.3d 80 (2004) (cautioning that, "if there has been no prior determination of an appropriate independent state constitutional analysis in a particular context, and no argument is made that a different analysis applies under the state constitution than applies under the federal constitution, then we will apply the federal analysis" (emphasis added)).
[4] See State v. Hendrickson, 129 Wash.2d 61, 69 n. 1, 917 P.2d 563 (1996) (observing that "[i]n particular, it is well settled that art. I, § 7 provides greater protection against warrantless searches of automobiles than the Fourth Amendment"); State v. Ladson, 138 Wash.2d 343, 348, 979 P.2d 833 (1999) (acknowledging the redundancy of a Gunwall analysis "in the context of the same legal issue . . ., namely warrantless stops of automobiles for the purpose of investigation").
[5] Because the majority does not reach the second step of the article I, section 7 analysis, the majority does not resolve the conflict in the opinions of Justices Fairhurst and Sanders.
[1] Every adult or juvenile individual convicted of a felony, stalking under RCW 9A.46.110, harassment under RCW 9A.46.020, communicating with a minor for immoral purposes under RCW 9.68A.090, or adjudicated guilty of an equivalent juvenile offense must have a biological sample collected for purposes of DNA identification analysis.

RCW 43.43.754(1).
[2] Often attributed to Lenin or Stalin, this expression originated in an 18th Century French proverb credited to either Robespierre or Napoleon: "On ne saurait faire une omelette sans casser des oeufs." Its Russian equivalent, "Lyes rubyat, shchepki letyat," roughly translates as, "When you chop wood, chips fly."
[1] The majority takes issue with our reliance on Juveniles to analyze Surge's rights under article I, section 7. It seems to be concerned that (1) because Juveniles does not involve felons, it is not analogous to the facts of this case and (2) the privacy interests discussed in Juveniles are inapplicable because they originate in Fourth Amendment, rather than article I, section 7, jurisprudence. Majority at 214. The fact that Juveniles involved juvenile sex offenders rather than adult felons does not detract from its value as an analogy to this case. Juveniles noted that the fact that the case involved juveniles was of no special relevance because the rights are coextensive with adults. 121 Wash.2d at 97 n. 8, 847 P.2d 455. Both involve classes of individuals with privacy interests in bodily integrity. Further, Juveniles did not rely solely on the Fourth Amendment jurisprudence in O'Hartigan v. Department of Personnel, 118 Wash.2d 111, 117, 821 P.2d 44 (1991) in assessing privacy interests as the majority claims. See majority at 214 n. 7. Juveniles also relied on this court's article I, section 7 jurisprudence involving freedom to refuse medical treatment. 121 Wash.2d at 97, 847 P.2d 455 (citing Farmer, 116 Wash.2d at 429, 805 P.2d 200 (citing In re Schuoler, 106 Wash.2d 500, 506-07, 723 P.2d 1103 (1986); In re Welfare of Colyer, 99 Wash.2d 114, 119-20, 660 P.2d 738 (1983); State v. Meacham, 93 Wash.2d 735, 738, 612 P.2d 795 (1980))).