# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of:<br><br>DAMON LEE,<br><br>                    Petitioner. | No. 52717-1-II<br><br><br>UNPUBLISHED OPINION |

MELNICK, J. — Damon Lee, a sexually violent predator (SVP), received his conditional release from the Special Commitment Center (SCC) to a less restrictive alternative (LRA). In the LRA order, the trial court created a transition team to manage Lee's conditional release. Lee argues that the delegation of authority to the transition team violated the separation of powers doctrine as well as the statutory scheme governing conditional release, that the conditions imposed in the LRA order violate his right to due process, and that the search provision in the LRA order violates his right to privacy. We affirm the trial court.

## FACTS

### I. LEE'S HISTORY OF SEXUAL VIOLENCE

Lee is in his sixties and has an extensive history of sexual violence. His sexual assault victims ranged from 2 to 39 years of age. Several of his victims were strangers. He utilized surprise, weapons, physical restraints, and threats of death during his assaults.

Lee's first reported assault occurred when he was 15 years old, and a 14-year-old girl reported that he sexually assaulted her in the woods. Lee's first arrest for sexual assault occurred

in 1973, when at the age of 17 years old, a 6-year-old girl reported that Lee grabbed her while she was on her way to school, placed a knife against her neck, and put his penis in her mouth. Lee admitted to the crime and received a 20-year prison sentence. He only disputed that he had a "piece of metal" and not a knife. Clerk's Papers (CP) at 489.

While on parole in 1979, Lee committed two non-sexual assaults. The court revoked his parole and he served the remainder of his term in prison. Lee later admitted that while on parole he attempted to put his penis in a 2-year-old male's mouth. This crime did not get prosecuted.

In 1982, Lee escaped from prison and, nine days later, committed an armed robbery in California. The court sentenced Lee to 30 months in confinement and, after serving time in California, he returned to Washington to complete his previous sentence.

In 1990, Lee picked up a female hitchhiker in the Tacoma area, stopped behind a building, pointed a gun at her, and directed her to perform oral sex on him in the vehicle. Lee then drove to an alley, ordered the woman into an open garage, threatened to "cap [her]" if she fought, and vaginally raped her. CP at 490-91. The police arrested Lee and a subsequent search of his apartment yielded "a significant number" of guns, knives, handcuffs, newspaper articles about two rape investigations, and an album labeled "Conquest Book" that contained photos of men and women engaged in sexual activities. CP at 492.

After his arrest, Lee was identified as a suspect in at least six other rape cases that occurred in the Tacoma area between 1988 and 1990. Lee pled guilty to one count of rape in the first degree and, as part of his plea agreement, prosecutors agreed not to charge Lee with any further sexual offenses. Lee later admitted to forcing approximately 55 women to engage in sexual activity between 1988 and 1990. Lee has been incarcerated or involuntarily committed since 1990.

II.     PROCEDURAL HISTORY

In 2004, a jury found Lee to be an SVP. The court committed him to the SCC on McNeil Island, operated by the Department of Social and Health Services (DSHS).

In 2017, an annual review report opined that even though Lee continued to be an SVP, he should be conditionally released to a LRA. The SCC Chief Executive Officer authorized Lee to petition for a LRA. Lee petitioned the court for an unconditional release. After two mistrials, the State stipulated that Lee was eligible for conditional release to a LRA.

In a proposed LRA order, the State recommended the appointment of a "transition team," consisting of the sex offender treatment provider, the assigned community corrections officer (CCO), and a designated representative from the SCC, to oversee and implement the LRA order. Lee would be required to obey written and verbal instructions from the transition team, and to seek their approval before participating in employment or educational opportunities, accessing the internet, obtaining a driver's license or driving, and possessing images of children, among others. The proposed order also forbade Lee from possessing a gun; entering adult entertainment establishment where nudity, erotic entertainment, or literature were for sale; consuming alcohol or controlled substances; accessing "chat lines"; and more.

Lee objected to the imposition of a transition team, all conditions that involved decision-making by the transition team, and a condition that would require him to submit to searches of his person or property at the discretion of his CCO. As part of his objection, Lee submitted testimony from Marcus Miller, the CCO who investigated his LRA proposal, that as long as no conflict existed with a LRA order, transition teams could impose conditions in the interest of "community safety or the person's safety." CP at 668.

Following a hearing on the contested LRA conditions, the trial court appointed a transition team, adopted the State's proposed conditions, and added a provision that it retained jurisdiction to modify the LRA order upon the motion of either party. In total, the LRA order contains 14 pages of conditions, including the following.

A. RESIDENTIAL CONDITIONS:

. . . .

5. Mr. Lee and [proposed landlord] shall permit home and property visits by any member of the Transition Team or designee for visual inspection of the residence, garage, and other structures on the property to ensure compliance with his Court Order. To maintain compliance with the conditions of the LRA Court Order, Mr. Lee shall submit to searches of his person, computer, cellphone, residence, or property at the discretion of the supervising CCO.

. . . .

C. TREATMENT CONDITIONS:

. . . .

3. Mr. Lee shall participate in any treatment, including, but not limited to sex offender treatment and any other treatment or therapy, as recommended by the Transition Team and approved by DSHS/SCC.

. . . .

D. STANDARD CONDITIONS:

. . . .

7. Mr. Lee shall not have intentional, regular conduct with any person who has not previously been approved by his Transition Team or the Court. Incidental contact with individuals for business-related purposes is not considered "intentional regular contact." This condition does not apply to individuals participating in Mr. Lee's treatment groups, AA meetings and mandatory activities, his attorney, [the proposed landlord], experts retained by his legal team, or agents of his attorney's law office. The Court or the Transition Team may review and modify this condition in writing with respect to specific individuals.

. . . .

11. Mr. Lee shall not purchase, possess, use, access, or view any sexually explicit material as defined by RCW 9.68.130, erotic materials defined by RCW 9.68.050, or any material depicting any person engaged in sexually explicit conduct as defined by RCW 9.68A.011(4). Mr. Lee shall not intentionally or negligently purchase, posses[s], play or view movies, television programming, printed materials, or video games for the purpose of causing or enhancing sexual arousal. This prohibition includes, but is not limited to, materials depicting consensual sex, sex with violence or force, sex with non-consenting adults, or sexual activity with children. Mr. Lee shall follow the procedure established by his Transition team if he inadvertently views, possesses, or interacts with media or material that could arguably violate this condition.

4

The [sex offender treatment provider] SOTP may make exceptions to specifically identified sexually explicit or erotic materials upon written notification to the other members of the Transition Team. Mr. Lee shall not share any approved materials with any other person.

12.	Mr. Lee shall not purchase, possess, view, or play any R-rated movies or M-rated video games. Mr. Lee shall not intentionally or negligently purchase, possess, play, or view movies, television shows, printed materials, or video games depicting sexual themes, children's themes, or excessive violence. The Transition Team may make exceptions to specifically identified games, shows, movies, or printed materials. The Transition Team will resolve any questions as to what constitutes sexual themes, children's themes, or excessive violence. Mr. Lee shall follow the procedure established by his Transition Team if he inadvertently views or possesses media or material that could arguably be depicting sexual themes, children's themes, or excessive violence.

. . . .

E.	SPECIAL CONDITIONS:

. . . .

2.	Mr. Lee shall not possess images of children or view media directed toward or focused on children without the prior consent of his Transition Team. Possession of visual depictions of semi-clad or naked children is prohibited. The Transition Team shall define in writing what "directed towards or focused on" means.

. . . .

5.	Prior to Mr. Lee's release from total confinement, the SCC shall provide a list of all approved media (books, movies, video games, CDs, etc.) to the assigned CCO. The Transition Team may approve or disapprove any of the items on the list. Any additional media must be pre-approved by the Transition Team prior to purchase, rental, and/or possession. If the SOTP approves media without the full agreement of the other Transition Team members, she shall provide notice of the decision to the other Transition Team members.

CP at 295, 297, 298, 299, 300, 301, 302-03, 306, 307. Lee appealed.

III.	TRANSITION TEAMS

Julia Crabbe has worked at the SCC since 2003, and began serving as the Community Programs Administrator in 2009. To her knowledge, every conditional release of an SVP to an LRA placement has involved a court appointed transition team, generally consisting of the person's sex offender treatment provider, the assigned CCO, and a representative from the SCC.

Transition teams manage the "day-to-day logistics" of a person on conditional release and they make decisions and recommendations related to "day-to-day activities," as set out in the LRA

order. CP at 164-65. Transition teams usually meet on a monthly basis to review and discuss the SVP's status and progress in treatment, but they communicate with each other, as needed, if issues requiring immediate attention arise. Teams usually meet in private, with the first part of the meeting being issue discussion and decisions making. The second part involves a "check-in" with the SVP and a discussion of decisions the team has made. CP at 775. Teams are not required to provide any record of what information they considered when reaching a decision.

As a part of their duties, the transition team is generally empowered by the commitment court to review trip plans, allow or restrict regular contact with victims and minors, approve educational or employment activities, approve the purchase or possession of R-rated media, require drug or alcohol testing, inspect cell phones and call data, and make other decisions related to the conditions imposed by the court. Transition teams are also generally empowered to consider other requests, such as a lessening of escort requirements or requests to obtain additional treatment, among others.

While the sex offender treatment provider is responsible for the SVP's ongoing sex offender treatment, the CCO is responsible for providing "ongoing supervision per the court order" and monitoring compliance with the release conditions. CP at 724.

Lee appeals.

ANALYSIS

I.    THE LRA ORDER DOES NOT VIOLATE SEPARATION OF POWERS OR APPLICABLE STATUTORY SCHEME

A.    Background — Sexually Violent Predators

SVPs are a "small but extremely dangerous group" of persons suffering from mental abnormalities or personality disorders that make them "likely to engage in sexually violent

6

behavior" where the "likelihood of engaging in repeat acts of predatory sexual behavior is high." RCW 71.09.010.

Washington commits SVPs for control and treatment in secure facilities. RCW 71.09.060(1). Secure facilities may be a total confinement facility, a secure community transition facility, or a sufficiently secure residence used for a court-ordered placement. RCW 71.09.020(16). Following annual mental health evaluations, SVPs committed to total confinement may petition for unconditional discharge or conditional release to a secure facility in the community. RCW 71.09.090. Unconditional discharge may only occur if the person seeking discharge no longer meets the definition of an SVP. RCW 71.09.060(1), .090.

Conditional release to confinement in a LRA in the community is available to persons who continue to be classified as SVPs who are "likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18), .090(1). But a conditional release may only be ordered by a court if it is in the SVP's best interests, conditions can be imposed to adequately protect the public, and mental health treatment and supervision requirements can be met. RCW 71.09.092, .096(1). Before being conditionally released to a LRA, the SVP must agree to comply with all treatment requirements imposed by the treatment provider, the court, and supervision conditions imposed by the Department of Corrections (DOC). RCW 71.09.092(4), (5). To ensure that all treatment requirements are met, the treatment provider must inform the court of treatment compliance and report any violations to the court, the prosecutor, and a CCO.

B.      Delegation of Authority Under RCW 71.09.092 and RCW 71.09.096

Lee argues that, by allowing the transition team to create and modify conditions of the LRA order, the court improperly delegated authority reserved to the court. We disagree.

7

Under RCW 71.09.092, only a court can order the release of an SVP to a LRA. To enter such a finding, the court must find the following:

> (1) The person will be treated by a treatment provider who is qualified to provide such treatment . . . ; (2) the treatment provider has presented a specific course of treatment . . .; (3) housing exists in Washington that is sufficiently secure to protect the community . . . ; (4) the person is willing to comply with the treatment provider and *all requirements imposed by the treatment provider* and by the court; and (5) the person will be under the supervision of the department of corrections and is willing to comply with supervision requirements *imposed by the department of corrections.*

RCW 71.09.092 (emphasis added).

Under RCW 71.09.096(2), (4), the trial court has the authority to "impose any additional conditions necessary to ensure compliance with treatment and to protect the community" and, prior to authorizing a release to a LRA, it "shall impose such conditions upon the person as are necessary to ensure the safety of the community."

The argument that a trial court cannot delegate any of its authority to create or modify conditions of community placement has been rejected by courts in similar contexts. This court has considered several challenges to DOC's authority to impose community custody conditions in cases arising from the Sentencing Reform Act of 1981. We have determined that "[s]entencing courts have the power to delegate some aspects of community placement to the DOC." *State v. Sansone*, 127 Wn. App. 630, 642, 111 P.3d 1251 (2005); see also *State v. McWilliams*, 177 Wn. App. 139, 152-53, 311 P.3d 584 (2013); *In re Pers. Restraint of Golden*, 172 Wn. App. 426, 290 P.3d 168 (2012).

In *State v. Autrey*, the defendant argued that a community custody condition requiring him to obtain prior approval from his CCO before engaging in sexual contact improperly delegated this authority to his CCO, but we concluded "[i]t is well settled that some delegation of the court's power is permitted." 136 Wn. App. 460, 469, 150 P.3d 580 (2006). In *McWilliams*, this court

8

explained that, while the decision to impose a sentence is the function of the courts, the decisions made to execute the sentence and reform the offender "are administrative in character and are properly exercised by an administrative body." 177 Wn. App. at 154 (quoting *Sansone,* 127 Wn. App. at 642); *see also State v. Mulcare*, 189 Wash. 625, 628, 66 P.2d 360 (1937).

Here, the SVP statutes grant the court explicit authority to "impose any additional conditions necessary to ensure compliance with treatment and to protect the community." RCW 71.09.096(2). What Lee characterizes as a delegation of "nearly unlimited authority," to the transition team[1] is in actuality a delegation of day-to-day administration. While the court may have the sole authority to grant a conditional release, the management of the day-to-day administration of a LRA order is administrative in nature, and the court can delegate administrative decisions. Because the conditions requiring Lee to comply with requirements imposed by the treatment provider and the DOC, representatives of which make up two-thirds of the transition team, are consistent with the statutory scheme, we reject Lee's claim.

B.     Excessive Delegation

Lee also argues that the delegation was excessive. Even when delegation is authorized, courts may not delegate "excessively." *Sansone*, 127 Wn. App. at 642. In *Sansone*, the trial court imposed a community supervision condition requiring Sansone to not possess or peruse pornography without prior approval of his probation officer, and left the definition of "pornography" to be defined by the probation officer. Throughout the proceedings, several "quite different" definitions of pornography were presented. *Sansone*, 127 Wn. App. at 642-43. This court concluded that, although delegation to define a term in a community placement condition

---

[1] Lee replies on testimony from CCO Miller for this contention, but a review of his testimony shows that Miller also explicitly stated that the conditions imposed could not conflict with the LRA order.

may be permissible in some circumstances, the delegation in this case was excessive because of vagueness. However, this court also said it "would not necessarily be improper if Sansone were in treatment and the sentencing court had delegated to the therapist to decide what types of materials Sansone could have." *Sansone*, 127 Wn. App. at 643.

In *United States v. Morin*, 832 F.3d 513, 514-15 (5th Cir. 2016), the trial court granted a sex offender treatment provider the authority to impose unspecified "lifestyle restrictions" on the offender as part of a supervised release program imposed as part of a criminal sentence. The court held that this delegation improperly permitted the treatment provider to impose "independent conditions of supervised release" that "might extend beyond the period of supervised release" because the court had "exclusive authority to impose sentences." *Morin*, 832 F.3d at 517-18. It would have been appropriate for the court to delegate the "manner and means" of therapy to be administered by the treatment provider, but a delegation of unspecified "lifestyle restrictions" was excessive. The *Morin* court specifically mentioned the difference between its case and *United States v. Fellows*, 157 F.3d 1197 (9th Cir. 1998). *Morin*, 832 F.3d at 517. In *Fellows*, the court upheld a condition directing the defendant to "'follow all other lifestyle restrictions or treatment requirements' imposed by his therapist." 157 F.3d at 1200. The *Morin* court noted that the challenged condition in *Fellows* "was tethered to the treatment program; it did not permit the therapist to impose conditions that would extend beyond the treatment program." *Morin*, 832 F.3d at 517.

Here, the court dictated 14 pages of detailed conditions for Lee to follow, leaving only specific details and a few undefined terms to the transition team, which included Lee's sex offender treatment provider. For example, as set forth above, the court forbade Lee to

> "purchase [or] possess . . . movies, television shows, printed materials, or video
> games depicting sexual themes, children's themes, or excessive violence. The

10

> Transition Team may make exceptions to specifically identified games, shows, movies, or printed materials. The Transition Team will resolve any questions as to what constitutes sexual themes, children's themes, or excessive violence."

CP at 302-03. Lee claims that leaving the definition of "sexual themes, children's themes, or excessive violence" to the transition team is excessive delegation.[2] It is worth noting that, where available, the court did cite statutory definitions for terms, such as sexually explicit material, erotic material. Here, with such terms as "children's themes" and "excessive violence," which are targeted to Lee's status as an SVP and history of sexual assaults involving violence and children, the court left the scope to the professional judgment of the treatment provider. This delegation, of the types of materials allowed a patient in treatment, is consistent with *Sansone* and does not resemble the unspecified "lifestyle restrictions" untethered from a treatment program prohibited in *Morin*.

Lee also challenges the provision ordering him to participate in "sex offender treatment and any other treatment or therapy, as recommended by the Transition Team and approved by DSHS/SCC." CP at 299. Courts have found requirements to participate in treatments only if ordered to do so by a probation officer to be impermissible delegations of judicial authority. See *United States v. Peterson*, 248 F.3d 79 (2d Cir. 2001). As it stands, however, the court is barred from even considering conditional release without the agreement of a treatment provider who "has presented a specific course of treatment and has agreed to assume responsibility for such treatment." RCW 71.09.092(2). As a condition of his release to a LRA, Lee is already under obligation to participate in treatment as ordered by his treatment provider. This condition complies

---

[2] Lee claims that he is also "barred . . . from possessing materials depicting 'consensual sex.'" Br. of Appellant at 17. This is misleading because "materials depicting consensual sex" is modified by "for the purpose of causing or enhancing sexual arousal" in the LRA order, and does not need additional clarification. CP at 302.

with the requirements from *Morin* and *Fellows* and is notably different from requiring a person to participate in treatment as unilaterally ordered by a probation officer.

Accordingly, we conclude that the conditions in the LRA order are not an excessive delegation of authority.

## II. THE LRA ORDER DOES NOT VIOLATE LEE'S RIGHT TO DUE PROCESS

Lee argues that provisions of the LRA order violate his right to due process because they are unconstitutionally vague and lack the procedural framework to ensure fairness. We disagree.

Conditions of release are reviewed for abuse of discretion and will be reversed only if they are manifestly unreasonable, but the imposition of an unconstitutional condition qualifies as manifestly unreasonable. *See State v. Bahl*, 164 Wn.2d 739, 753, 193 P.3d 678 (2008).

### A. Lee's Restricted Access to Media

Lee argues that, except for the provisions citing specific statutory definitions, all of the conditions in the LRA restricting his access to certain media, including conditions prohibiting media depicting "sexual themes," "children's themes," "excessive violence," "images of children," or "media directed toward or focused on children," are unconstitutionally vague and an infringement on his First Amendment rights.[3,4] Br. of Appellant at 22. We disagree.

---

[3] Lee does not argue that the condition violates article I, section 5 of the Washington Constitution.

[4] In footnotes, Lee also argues that a provision requiring him to "not frequent or loiter outside of establishments that cater primarily to minors," including "elementary schools, junior high or middle schools, high schools, daycares, parks, recreation areas, playgrounds, school bus stops, swimming pools, zoos, and arcades" is unconstitutionally vague. CP at 301; Br. of Appellant at 18 n.19, 22 n.24. We do not need to consider arguments raised solely in footnotes. *State v. N.E.*, 70 Wn. App. 602, 606 n.3, 854 P.2d 672 (1993). It is, however, worth noting that similar provisions barring offenders from places where children "congregate," accompanied by nonexclusive lists of illustrative examples, have recently been upheld. *State v. Wallmuller*, 194 Wn.2d 234, 241, 449 P.3d 619 (2019).

"[T]he due process vagueness doctrine under the Fourteenth Amendment and article I, section 3 of the state constitution requires that citizens have fair warning of proscribed conduct." *Bahl*, 164 Wn.2d at 752. Its purpose is to ensure citizens have fair warning of what conduct must be avoided and protect those citizens from arbitrary enforcement. *Bahl*, 164 Wn.2d at 752-53.

A court order is unconstitutionally vague if "either a reasonable person would not understand what conduct is prohibited or if it lacks ascertainable standards that prevent arbitrary enforcement." *State v. Casimiro*, 8 Wn. App. 2d 245, 250, 438 P.3d 137, *review denied*, 193 Wn.2d 1029 (2019). When determining if a term is unconstitutionally vague, courts do not consider the term in a vacuum, but instead consider it in the context in which it is used. *Bahl*, 164 Wn.2d at 754. "'[I]mpossible standards of specificity' or 'mathematical certainty' are not required because some degree of vagueness is inherent in the use of language." *State v. Halstien*, 122 Wn.2d 109, 118, 857 P.2d 270 (1993) (quoting *City of Seattle v. Eze*, 111 Wn.2d 22, 26-27, 759 P.2d 366 (1988)). Rather, if a person "of ordinary intelligence can understand what the [condition] prescribes, notwithstanding some possible areas of disagreement, the [condition] is sufficiently definite." *City of Spokane v. Douglass*, 115 Wn.2d 171, 179, 795 P.2d 693 (1990).

Additionally, if a statute or other legal standard concerns material that is protected under the First Amendment protections of speech or expressive conduct, a vague standard is even more concerning, because it can have a chilling effect on First Amendment freedoms. *Grayned v. City of Rockford*, 408 U.S. 104, 109, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). Accordingly, "a stricter standard of definiteness applies if material protected by the First Amendment falls within the prohibition." *Bahl*, 164 Wn.2d at 753. To avoid conflict with the First Amendment, a condition of release must be "narrowly tailored" and "directly related" to the goals of protecting the public and promoting rehabilitation. *United States v. Loy*, 237 F.3d 251, 256 (3rd Cir. 2001).

Because the issue of First Amendment rights governs the strictness of our review of unconstitutional vagueness, we begin with that issue. Here, Lee argues that the media prohibited by the LRA order is not narrowly tailored nor directly related to protection of the public or Lee's treatment needs. Lee claims that the language of "sexual themes, children's themes, or excessive violence" is so broad as to cover nearly every work of literature, art, or popular culture.

Setting aside the many works that would not be covered by those definitions, Lee has a long history of sexual violence, including sexual violence toward children. It is not unreasonable to believe that preventing Lee from accessing materials involving sexual conduct, children's themes, and excessive violence is narrowly tailored to help in his treatment as an SVP who has previously targeted children. The conditions in question allow Lee to request approval for specific media, even if it falls in a prohibited class, and for a small team involving his sex offender treatment provider to determine whether or not the media would be appropriate for him. Accordingly, we conclude that the provisions prohibiting certain media do not violate Lee's First Amendment rights.

Turning to the question of vagueness, Lee is contesting every condition restricting his access to media that does not contain a reference to a specific statutory definition, to specifically include conditions, in his words, prohibiting media depicting "consensual sex," "sexual themes, children's themes, or excessive violence," "images of children," or "media directed toward or focused on children." Br. of Appellant at 22. The contested provisions actually state:

> 11.     Mr. Lee shall not purchase, possess, use, access, or view any sexually explicit material as defined by RCW 9.68.130, erotic materials defined by RCW 9.68.050, or any material depicting any person engaged in sexually explicit conduct as defined by RCW 9.68A.011(4). Mr. Lee shall not intentionally or negligently purchase, posses[s], play or view movies, television programming, printed materials, or video games for the purpose of causing or enhancing sexual arousal. This prohibition includes, but is not limited to, materials depicting consensual sex, sex with violence or force, sex with non-consenting adults, or

14

sexual activity with children. Mr. Lee shall follow the procedure established by his Transition team if he inadvertently views, possesses, or interacts with media or material that could arguably violate this condition.

The SOTP may make exceptions to specifically identified sexually explicit or erotic materials upon written notification to the other members of the Transition Team. Mr. Lee shall not share any approved materials with any other person.

12. Mr. Lee shall not purchase, possess, view, or play any R-rated movies or M-rated video games. Mr. Lee shall not intentionally or negligently purchase, possess, play, or view movies, television shows, printed materials, or video games depicting sexual themes, children's themes, or excessive violence. The Transition Team may make exceptions to specifically identified games, shows, movies, or printed materials. The Transition Team will resolve any questions as to what constitutes sexual themes, children's themes, or excessive violence. Mr. Lee shall follow the procedure established by his Transition Team if he inadvertently views or possesses media or material that could arguably be depicting sexual themes, children's themes, or excessive violence.

. . . .

2. Mr. Lee shall not possess images of children or view media directed toward or focused on children without the prior consent of his Transition Team. Possession of visual depictions of semi-clad or naked children is prohibited. The Transition Team shall define in writing what "directed towards or focused on" means.

CP at 302-03, 307. Lee mentions several times that the prohibited media "is broad enough to cover a movie such as *Titanic*, the DSHS pamphlet 'Eating Well for Less,' and artwork created in previous centuries." Br. of Appellant at 22; see also Br. of Appellant at 6, 17.[5] But Lee's assertion lacks context. The items must be "intentionally or negligently" viewed. CP at 302. Some of the items are prohibited only if viewed "for the purpose of causing or enhancing sexual arousal." CP at 302. A person of ordinary intelligence would be able to view the prohibited materials list and know what materials to avoid.

---

[5] This specific set of examples arises from a series of questions Lee's counsel asked Miller, regarding if each of the examples could be considered "pornography" or otherwise in violation under the LRA order general condition number 11 or special condition number 2. Setting aside the fact that condition number 11 does not use the word "pornography," Miller began his answer with an explanation that the definition of prohibited materials would be different for different offenders, based on their specific cases.

For additional clarity in determining what materials are prohibited, another provision gives precise notice of what materials *are* approved:

> Prior to Mr. Lee's release from total confinement, the SCC shall provide a list of all approved media (books, movies, video games, CDs, etc.) to the assigned CCO. The Transition Team may approve or disapprove any of the items on the list. *Any additional media must be pre-approved by the Transition Team prior to purchase, rental, and/or possession.* If the SOTP approves media without the full agreement of the other Transition Team members, she shall provide notice of the decision to the other Transition Team members.

CP at 307 (emphasis added). Taken together, there can be little uncertainty in what materials are prohibited and, if Lee wants to purchase or possess a material not on the approved list, he knows he must seek pre-approval from the transition team. We conclude that the conditions restricting what types of media Lee may access are sufficiently definite to notify Lee of the type of media he must avoid.

B.      Ascertainable Standards

Lee also briefly argues that, as part of unconstitutional vagueness, the LRA order does not provide an ascertainable standard to guide the transition team's decision making. We disagree.

As stated above, a court order is unconstitutionally vague if either "a reasonable person would not understand what conduct is prohibited *or if it lacks ascertainable standards that prevent arbitrary enforcement*." *Casimiro*, 8 Wn. App. 2d at 250 (emphasis added). Aside from the general rule requiring ascertainable standards in *Casimiro*, the parties cite little authority in support of their arguments. RCW 71.09.096 requires that a conditional release both be in the best interest of the person to be released and designed to protect the community, but the LRA order does not specifically repeat this standard. Accordingly, even though the standard is not explicitly stated in the LRA order, it is in the governing statutory scheme. We conclude that the Transition Team's decision making is guided by an ascertainable standard.

16

C.     Procedural Due Process

Lee argues that, because the transition team has the authority to restrict his liberty interests, the LRA order's failure to specifically outline procedures governing the team's exercise of their authority is a violation of procedural due process under the federal and state constitutions. We disagree.

Under the Fourteenth Amendment to the United States Constitution, government may not deprive an individual of "life, liberty, or property without due process of law." U.S. CONST. amend. XIV, § 1.[6] When a state seeks to deprive a person of a protected interest, procedural due process requires that the person receive notice of the deprivation and an opportunity to be heard "'at a meaningful time and in a meaningful manner'" appropriate to the case. *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965)); *see also Yim v. City of Seattle*, 194 Wn.2d 682, 688, 451 P.3d 694 (2019).

Here, before the LRA order can be revoked, RCW 71.09.098 entitles Lee to procedural safeguards, including a hearing. At any such hearing, the State would bear the burden of proof to show that Lee violated the conditions of release. RCW 71.09.098(5)(c). While it is possible that Lee's movement might be restricted or that he could be taken into custody pending a hearing, the court must "promptly schedule a hearing" if he is taken into custody. RCW 71.09.098(3)(b).

If Lee disagrees with a decision made by the transition team, he also has the right to petition the court to review the team's decision and modify the LRA order. Lee's arguments portray the

---

[6] "Washington's due process clause does not afford broader protection than that given by the Fourteenth Amendment to the United States Constitution." *State v. McCormick*, 166 Wn.2d 689, 699, 213 P.3d 32 (2009).

operation of the transition team as a dramatic departure from the terms of the LRA order, but their power is limited to the terms contained in the order, which was imposed by the trial court after a full hearing. For example, Lee alleges that the transition team could "prohibit him from speaking with anyone." Br. of Appellant at 26. But the LRA order is what specifically forbids Lee from calling anyone other than approved chaperones, members of his transition team, or his legal team, without pre-approval from the transition team.

Accordingly, we conclude that the procedural safeguards in RCW 71.09.098 sufficiently protect Lee's procedural due process rights

III.    THE LRA ORDER'S SEARCH PROVISION DOES NOT VIOLATE LEE'S RIGHT TO PRIVACY

Lee argues that the condition requiring him to "'submit to searches of his person, computer, cellphone, residence, or property at the discretion of the supervising CCO,'" without imposing limitations, violates his privacy rights under the Fourth Amendment to the United States Constitution and article 1, section 7 of the Washington Constitution. Br. of Appellant at 29 (quoting CP at 297). We disagree.

Washington's constitution "'recognizes an individual's right to privacy with no express limitations' and places greater emphasis on privacy" than the federal constitution. *State v. Ladson*, 138 Wn.2d 343, 348-49, 979 P.2d 833 (1999) (internal quotation marks omitted) (quoting *State v. Young*, 123 Wn.2d 173, 180, 867 P.2d 593 (1994)). The privacy right that Washington's article 1, section 7, protects is not absolute, however, and the State "may reasonably regulate this right [in order] to safeguard society." *State v. Meacham*, 93 Wn.2d 735, 738, 612 P.2d 795 (1980); *see also In re Det. of Williams*, 163 Wn. App. 89, 97, 264 P.3d 570 (2011). The State may reduce an individual's right to privacy to the extent "'necessitated by the legitimate demands of the operation

18

of the [community supervision] process.'" *State v. Cornwell*, 190 Wn.2d 296, 303-04, 412 P.3d 1265 (2018) (quoting *State v. Olsen*, 189 Wn.2d 118, 125, 399 P.2d 1141 (2017)).

Washington courts have specifically recognized the reduced privacy interests of sex offenders due to the threat they pose to public safety. *In re Det. of Campbell*, 139 Wn.2d 341, 356, 986 P.2d 771 (1999) ("the truncated privacy interests of the convicted sex offender" are outweighed by a substantial interest in public safety); *see also Det. of Williams*, 163 Wn. App. at 97.

Lee argues that, whatever the "legitimate demands" of the LRA supervision process, the search provision in the LRA order must have some limitations. Br. of Appellant at 31. In support of his argument, Lee relies on the cases of *Cornwell*, 190 Wn.2d at 303-04, and *Arnzen v. Palmer*, 713 F.3d 369, 372 (8th Cir. 2013). Both are factually distinguishable from this case.

In *Cornwell*, which Lee cites for the proposition that persons with reduced expectations of privacy "do not forfeit all expectations of privacy in exchange for their release into the community," the Sentencing Reform Act expressly required a CCO to have "reasonable cause to believe that an offender has violated a condition or requirement of the sentence" before searching a person on probation. 190 Wn.2d at 302-03; RCW 9.94A.631(1). There is no such requirement in the SVP statute. Ch. 71.09 RCW.

*Arnzen* involved the placement of cameras in a commitment facility's bathrooms. 713 F.3d at 372. The court upheld a preliminary injunction prohibiting the cameras in single-person bathrooms and denied a preliminary injunction seeking to prevent the use in multi-person bathrooms. *Arnzen*, 713 F.3d at 371. Regarding the single-person bathrooms, the court noted that the cameras operated without any "indication that [the bathroom was] being used for purposes other than those ordinarily associated with bathroom facilities" and were therefore a violation of

the patients' reasonable expectation of privacy. *Arnzen*, 713 F.3d at 373. The placement of the cameras into bathrooms was an important factor, because the court also noted that the detainees "[did] not have a reasonable expectation of privacy in their jail cells." *Arnzen*, 713 F.3d at 372.

Lee is an SVP who is confined to a secure facility[7] and, by law, is considered mentally ill, dangerous, and likely to reoffend. RCW 71.09.020(18). As such, he does not have a reasonable expectation of privacy in his residence or possessions. For the protection of the public, Lee's community corrections officer must be able to search Lee and his possessions at any time. The "legitimate demands" of the LRA supervision process necessitate random searches, and we hold that the substantial interest in protecting the public from Lee outweighs his reduced privacy interest.

We affirm the trial court.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Worswick, J.

_____
Sutton, A.C.J.

---

[7] "Secure Facility" includes both "total confinement facilities" and "any residence used as a court-ordered placement under RCW 71.09.096." RCW 71.09.020(16).